IN THE MATTER OF THE ADOPTION OF A CHILD
OF INDIAN HERITAGE.

Argued January 4, 1988—Decided July 7, 1988.

156

158

*Brian J. Sexton* argued the cause for appellants Kenneth Wright, Jr., Amy Whiting, Janet Moran, Frances McKnight, Larry S. Wright, Kenneth Wright, Sr., Joyce Wright and Clayton Wright (*Sterns, Herbert, Weinroth & Petrino*, attorneys and *Robert Santaloci*, attorney; *Brian J. Sexton* and *Robert Santaloci*, on the briefs).

*Margaret Goodzeit* argued the cause for respondents "Adoptive Parents" (*Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein*, attorneys).

*Jack F. Trope* submitted a letter in lieu of brief on behalf of *amicus curiae* Association on American Indian Affairs, Inc.

The opinion of the Court was delivered by

HANDLER, J.

In this appeal, we are asked to vacate a three-year old private placement adoption of an infant, alleged to be an American Indian, on the grounds that the adoption proceedings failed to conform to the requirements of state law and the federal Indian Child Welfare Act, 25 *U.S.C.* §§ 1901–63 (1982) ("ICWA" or "Act"), which governs the adoption of Indian children.   In

addressing this request for relief, we must treat a number of threshold jurisdictional issues relating to the applicability of the Indian Child Welfare Act to the child as well as to the petitioners, who claim respectively parental and familial rights. We also must consider the legal sufficiency of the adoption proceedings under both the federal Act and state law. Under the circumstances surrounding this case, we conclude that the adoption should not be disturbed. We do so because the trial court's decision in refusing to vacate the judgment of adoption did not offend the requirements of either the state adoption laws or the Indian Child Welfare Act, and did not constitute an abuse of discretion.

I.

The child who is the subject of these proceedings has been referred to as Baby Larry. Petitioners, Kenneth Wright Jr., who claims to be the father of the child, and members of his extended family, moved to vacate the adoption on the grounds that they were not provided notice of the adoption proceedings and that the adoption of this child was not in accord with the requirements of the ICWA. Their claims necessitate a detailed and comprehensive recapitulation of the procedural history and facts in the case.

Wright and the child's mother [1] are both registered members of the Rosebud Sioux Indian Tribe. Neither has lived, at any time relevant to this case, on the tribal reservation, residing instead in towns that border the reservation. Wright had earlier fathered the mother's first child (not Baby Larry), and for much of the time period relevant to this appeal resided with her and their first child.

In December of 1983, Baby Larry's mother discovered she was pregnant; in that same month Wright, who was then away,

---

[1] Both Baby Larry's mother and his adoptive parents have requested anonymity.

returned to live with her in Winner, South Dakota. Wright's attitude towards the pregnancy is an issue in dispute. In her affidavit to the trial court, the mother claimed that Wright denied that he was the father of the child and offered her $300 to use to get an abortion. Wright, in contrast, states that he claimed to be the father of the child and objected to the mother's plan to give up the child. When she went into labor, however, Wright went to visit relatives in nearby Mission, South Dakota, and did not return until after the mother had placed the child with his adoptive parents. Thus, neither Wright nor any of the members of his extended family have ever seen Baby Larry, who is now approaching his fourth birthday.

Baby Larry was born on August 17, 1984. Prior to the baby's birth, his mother communicated with lawyers in New York about placing the child for adoption. On August 24, 1984, she traveled to New York and executed a consent to adoption and termination of parental rights. The next day, the mother met the adoptive parents, who are New Jersey residents, and turned Baby Larry over to them before returning to South Dakota. On September 3, 1984, the adoptive parents' attorney filed a complaint for adoption in the Chancery Division, Family Part, in Middlesex County. A week later, on September 11, 1984, the trial court granted the adoptive parents temporary custody of Baby Larry, and appointed Better Living Services, a private adoption agency, to prepare a report on the proposed adoption pursuant to *N.J.S.A.* 9:3–48. A preliminary hearing was scheduled for November 16, 1984.

After relinquishing the child, the mother returned to Winner, and a short time later Wright moved back in with her. There is a dispute over the sequence of events that followed Wright's resumption of his cohabitation with the mother and their first child. Respondents claim that on September 19, 1984, their attorney mailed notice of hearing and consent-to-adoption forms to both the mother and Wright at the mother's Winner address, as well as an additional set of forms sent to Wright at the

address of his relatives in Mission, South Dakota. All three sets of forms were mailed certified mail return receipt requested, accompanied by a cover letter identifying the enclosed forms and providing instructions on how to complete them, including the attorney's telephone number should Wright or the mother require his assistance. Although the return receipts have not been produced due to lack of cooperation on the part of the attorney, proof of mailing has been produced, and the forms sent to the mother were completed and returned by her prior to October 1, 1984. According to respondents, Wright telephoned the attorney and consented to the adoption, but never returned the consent form.

Wright, on the other hand, denies that the attorney ever communicated with him and that he ever called the attorney, contending that the only documents he received were a letter and a consent-to-adoption form from Better Living Services. Wright's version of these events is suspect. Better Living Services, which had been appointed by the court to prepare the pre-adoptive report on the fitness of the child for adoption, never sent such a letter to Wright. It did, however, send a letter to the mother at the Winner, South Dakota address where she and Wright were living, requesting her help in the preparation of the pre-adoptive report.[2] The trial court, noting that a consent form could not have been sent to Wright from Better Living Services, discredited Wright's version of the facts and found that Wright in fact had been provided notice. In light of this, Wright argues on appeal that he received only a consent-to-adoption form, and that whoever sent the consent form intentionally failed to include a notice of hearing or any other form of documentation.

On October 15, 1984, respondents filed an amended complaint, which repeated the mother's allegation that the father of

---

[2]This letter, dated September 25, 1984, disclosed the place and time of the preliminary hearing on the adoption petition, as well as the telephone number of Better Living Services.

the child was unknown but disclosed Wright's claim of paternity. Although the complaint mentioned that Wright had orally consented to the adoption, it conceded that no written consent had been returned, and asked that Wright's parental rights be terminated on the grounds that he had forsaken his parental obligations. At the November 16, 1984 preliminary hearing, the trial court found that Baby Larry was fit for adoption and that the adoptive parents were fit. It appointed Better Living Services as next friend, granted the adoptive parents custody pending the final adoption hearing scheduled for May 24, 1985, and terminated the parental rights of the mother and Wright. There being no change in the parties' status, the court entered a final judgment of adoption on May 24, 1985, which explicitly terminated the parental rights of the mother and Wright. At no time during either proceeding was there any indication that Baby Larry might be an Indian child. In fact, the report from Better Living Services listed the race of both the mother and Baby Larry as Caucasian.

With the exception of one inquiry to the Rosebud Sioux Tribe in the fall of 1984, of which there is no record, it appears that Wright did nothing to locate or regain custody of Baby Larry from the fall of 1984 until January of 1986, despite the fact that during much of this time he was living with the mother and their first child. Early in January of 1986, however, Wright contacted South Dakota Legal Services, which in turn contacted the Association of American Indian Affairs, an Indian rights organization, which in turn initiated inquiries with the Middlesex County Surrogate's Office on January 8, 1986. Subsequently, Wright obtained representation from Middlesex County Legal Service Corporation, which filed a notice of motion to vacate the adoption of Baby Larry on May 23, 1986, one day before the one-year period to overturn a judgment on the basis of fraud, *see R.* 4:50–1, 4:50–2, would have expired. In addition to alleging fraud, Wright included an affidavit that he is an enrolled member of the Rosebud Sioux Tribe and that the adoption of Baby Larry, who he claims to be his son, was in

violation of the ICWA. On these grounds, he requested that the adoption be vacated, his parental rights re-established, and that the matter be transferred to the Rosebud Sioux Tribal Court.

The trial court conducted a hearing on Wright's motions on June 6, 1986. In an order dated June 27, 1986, it denied Wright's motions to vacate the adoption, reinstate his parental rights, and transfer the matter to the Rosebud Sioux Tribal Court without prejudice, thus giving Wright a second opportunity to show that the ICWA applied and required such action. The court, however, did grant Wright access to certain parts of the case file, limited to protect the identity of the adoptive parents.

Following the initial hearing, Wright's attorney contacted the Rosebud Sioux Tribe to determine whether Baby Larry qualified for tribal membership and whether the tribe would be interested in intervening in the New Jersey proceedings. The tribe replied that since the mother, although an enrolled Rosebud Sioux, has only 9/32 Rosebud Sioux blood, Baby Larry, relying solely on the basis of his mother's enrollment, would not meet the one-quarter blood quotient requirement. The tribe also declined to intervene on the grounds of insufficient funds. On October 17, 1986, however, a group of Wright's relatives led by Amy Whiting, Wright's sister, moved to intervene on the grounds that the ICWA gave them standing as potential custodians of Baby Larry.

On November 7, 1986, the trial court heard argument on Wright's renewed petition to vacate the adoption, as well as his relatives' petition to intervene. It concluded that Baby Larry was not an Indian child under the ICWA and that Wright had not acknowledged paternity at the time of the adoption proceedings, had had notice of the proceedings, and had waited too long to assert any rights he might have had under the federal Indian laws. Wright and his relatives appealed to the Appellate Division, which issued an opinion concluding that the trial court had

not abused its discretion in refusing to vacate the final judgment of adoption. *In re Adoption of a Child of Indian Heritage,* 219 *N.J.Super.* 28 (App.Div.1987). This Court granted appellants' petition for certification, 109 *N.J.* 57 (1987).

## II.

In determining this appeal, we are constrained to consider the applicability of the Indian Child Welfare Act to this adoption proceeding. The Act, if applicable, dictates the issues that will be critical to the claims of the respective parties. It is therefore necessary to understand the nature and purpose of the ICWA.

The ICWA is primarily concerned with preserving the continued existence and integrity of Indian tribes by preventing the unwarranted removal of Indian children from their families by nontribal public and private agencies, *see* 25 *U.S.C.* § 1901(3), (4); *H.R.Rep. No.* 1386 95th Cong. 2d Sess. 9, *reprinted in* 1978 *Code Cong. & Ad.News,* 7530, 7531. The Act is intended to combat the removal of Indian children by state administrative and judicial bodies through a failure to recognize and appreciate the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families. *See* 25 *U.S.C.* § 1901(5). In particular, Congress was concerned with outright bias against Indians by state social workers as well as the more subtle problem of social workers untutored in the ways of Indian family life mistaking methods of raising and disciplining children within an extended Indian family for excessive permissiveness, neglect, or abandonment. *H.R.Rep. No.* 1386, *supra,* at 10, *reprinted in* 1978 *Code Cong. & Ad.News* at 7532. Additionally, it found that the dependency of many Indian parents on state welfare agencies frequently resulted in coerced "voluntary" placements of Indian children, *id.,* an anomaly of the social welfare system that is not limited to Indian families, *see, e.g., Sorentino v. Family & Children's Soc. of Elizabeth,* 72 *N.J.* 127, 129 (1976) (*Sorentino I* ), appeal

after remand, 74 *N.J.* 313 (1977) (*Sorentino II*), aff'd after remand, 77 *N.J.* 483 (1978).

Furthermore, Congress found that the erosive effects of these practices on Indian society were multiplied by the fact that the same cultural biases that led to excessive removal of Indian children from their families militated against the selection of Indians as foster or adoptive parents. As a result, it would frequently come to pass that an Indian child, once removed from his or her parents, would become separated from all aspects of Indian culture. *H.R.Rep. No.* 1386, *supra*, at 11, *reprinted in* 1978 *Code Cong. & Ad.News* at 7533. This not only posed a threat to the stability and security of Indian tribes, but also carried with it the potential for psychological harm to the Indian child; studies of Indian children placed in non-Indian homes have revealed instances of ethnic confusion and a sense of abandonment. *See* Barsh, "The Indian Child Welfare Act of 1978, A Critical Analysis," 31 *Hastings L.J.* 1287, 1291 (1980).

To address these concerns, Congress in 1978 passed the Indian Child Welfare Act. Its declaration of policy states that:

The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs. [25 *U.S.C.* § 1902]

The Act attempts to protect the welfare of Indian families by conferring on tribal courts exclusive jurisdiction over any child custody proceedings involving an Indian child who resides or is domiciled on the tribe's reservation, 25 *U.S.C.* § 1911(a), and provides for the permissive transfer of state court custody proceedings to a tribal court, 25 *U.S.C.* § 1911(b). The Act also grants the child's tribe the right to intervene in any such proceeding that is not removed to a tribal court. 25 *U.S.C.* § 1911(c).

In addition, in state court proceedings involving involuntary placement of Indian children, the Act calls for notice to be given

to the child's parents or custodian, and the child's tribe if the court has reason to believe an Indian child is involved, 25 *U.S.C.* § 1912(a). It also provides for family counselling and court-appointed counsel to ensure that the relevant parties are fully aware of their legal rights. 25 *U.S.C.* § 1912(b)–(d). Finally, the Act establishes substantive standards for involuntary termination of an Indian parent's parental rights exceeding those provided for non-Indian parents under state law. Under 25 *U.S.C.* § 1912(f), termination of parental rights cannot be ordered unless there is "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." The Act also contains provisions for ensuring that voluntary placements are uncoerced and fully informed, 25 *U.S.C.* § 1913, as well as providing mechanisms for challenging placements that did not conform to the Act's requirements, 25 *U.S.C.* § 1914, facilitating the return of Indian children to their parents, 25 *U.S.C.* § 1916, and calling for Indian children, whenever possible, to be placed in an Indian environment, 25 *U.S.C.* § 1915.

Respondents stress that this is a case where an unwed mother voluntarily relinquished her child to a couple for adoption without that child ever having lived in an Indian environment or with an Indian family. Respondents argue that it is unnecessary to consider the ICWA, because Congress never intended for the Act to apply in situations similar to this case.

Initially, there appears to be some support for this position; there is nothing in the Act itself or the House Report that specifically refers to such a proceeding. Furthermore, it can be argued that the primary vice intended to be remedied by the Act, the unjustified and involuntary removal of Indian children from an Indian environment followed by placement in non-Indian homes by state welfare agenices, *see* Barsh, *supra*, 31 *Hastings L.J.* at 1305, is not an issue if the mother's relinquish-

ment is truly voluntary. Finally, a recurring fact pattern in such cases is that the mother of an Indian child consented to the adoption in order to avoid having the child raised in an Indian environment, *see, e.g., In re Adoption of Halloway,* 732 *P.*2d 962, 968 (Utah 1986), a sentiment expressed by Baby Larry's mother in her affidavit to the trial court in this case.[3] Application of the ICWA in such cases, particularly where it is the tribe or the parents' relatives rather than the father himself who seeks to set aside the adoptive placement, *see, e.g., Kiowa Tribe of Oklahoma v. Lewis,* 777 *F.*2d 587 (10th Cir.1985), *cert.* denied, 479 U.S. 872, 107 *S.Ct.* 247, 93 *L.Ed.*2d 171 (1986), is in some ways an intrusion on the mother's ability to determine what is in the best interests of her child.

Citing such concerns, a number of state courts, following the lead of the Kansas Supreme Court in *In re Adoption of Baby Boy L,* 231 *Kan.* 199, 643 *P.*2d 168 (1982), have determined that the ICWA does not apply where an unwed mother voluntarily relinquishes her child for adoption shortly after birth. Since no coercive state activities are involved, assuming a private adoptive placement is truly voluntary, and the removal is not breaking up an existing Indian family, these courts have concluded that the concerns addressed by the Act were not implicated and that Congress did not intend that the Act apply. *See In re S.A.M.,* 703 *S.W.*2d 603 (Mo.App.1986); *In re Adoption of Baby Boy D,* 742 *P.*2d 1059 (Okl.1985), *cert.* denied sub nom. *Harjo v. Duello,* —— *U.S.* ——, 108 *S.Ct.* 1042, 98 *L.Ed.*2d 1005 (1988); *Claymore v. Serr,* 405 *N.W.*2d 650 (S.D.1987) (following reasoning of *In re Adoption of Baby Boy L* ).

We disagree with this interpretation of the Act because it posits as a determinative jurisdictional test the voluntariness of the conduct of the mother. The Act itself does not suggest this factor as a jurisdictional test of the Act's coverage, although it

---

[3] In fact, the mother has requested that the tribe not assist petitioners' attempt to vacate the adoption.

is unquestionably relevant in the Act's application. Under the ICWA, "child custody proceeding" is defined as including "any action resulting in the termination of the parent-child relationship," 25 *U.S.C.* § 1903(1)(i)–(ii), and the Act itself specifies procedures for voluntary terminations of parental rights. 25 *U.S.C.* § 1913. In addition, the application of the ICWA to voluntary private placement adoptions is not inconsistent with the purposes of the Act, particularly in cases in which an unwed father has not consented to the adoption. The congressional findings accompanying the Act recite that Congress has assumed responsibility for the protection and preservation of Indian tribes, and that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children...." 25 *U.S.C.* § 1901(2)–(3). The effect on both the tribe and the Indian child of the placement of the child in a non-Indian setting is the same whether or not the placement was voluntary.

Furthermore, the economic factors that led Congress to provide safeguards against induced voluntary relinquishments to state agencies are equally implicated in private placement adoptions, *see Barsh, supra,* 31 *Hastings L.J.* at 1299, concerns that have long colored our own perceptions of private placement adoptions, *see, e.g., In re Baby M,* 109 *N.J.* 396, 423–29 (1988); *Sees v. Baber,* 74 *N.J.* 201, 217 (1977). Finally, while an unwed mother might have a legitimate and genuine interest in placing her child for adoption outside of an Indian environment, if she believes such a placement is in the child's best interests, consideration must also be given to the rights of the child's father and Congress' belief that, whenever possible, it is in an Indian child's best interests to maintain a relationship with his or her tribe. *See In re Adoption of K.L.R.F.,* 356 *Pa.Super.* 555, 558, 515 *A.*2d 33 (1986), appeal dismissed, 516 *Pa.* 520 (1987).

For these reasons, we decline to follow the interpretation of the ICWA urged by respondents, which would preclude its

application to voluntary private placement adoptions, and we decline to do so even where the child has never lived with an Indian family or in an Indian environment. *See, e.g., In re Appeal in Maricopa County,* 136 *Ariz.* 528, 533, 667 *P.*2d 228, 233 (App.1983); *In re Custody of S.B.R.,* 43 *Wash.App.* 622, 625–26, 719 *P.*2d 154, 156 (1986) (also rejecting the reasoning of *In re Adoption of Baby Boy L* ).

■ The ICWA's application, however, still remains contingent on whether an Indian child is the subject of a child custody proceeding. 25 *U.S.C.* §§ 1903(1), 1903(4). This, in turn, impels us to determine when, under the Act, the child involved is deemed to be an Indian. "Indian child" is defined in 25 *U.S.C.* § 1903(4) as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." Because Baby Larry's mother is only 9/32 Rosebud Sioux, based on his mother's lineage alone he is only slightly more than one-eighth Rosebud Sioux, and therefore is not eligible for tribal membership unless his father is of sufficient Indian ancestry such that the child would be of one-quarter or more Rosebud Sioux blood. Wright, the putative father, is 17/32 Rosebud Sioux and is an enrolled member of the tribe. If paternity were attributed to Wright, it appears that Baby Larry would be eligible for membership. The Rosebud Sioux, however, determined that Baby Larry is not currently eligible for membership, not because his ancestry is not in fact more than one-quarter Rosebud Sioux, but because his ancestry is uncertain, since no affidavit of paternity has ever been filed with the tribe. Contending that Wright is in fact the father, petitioners assert that Baby Larry is an Indian child. Respondents argue that since the Tribe has refused to enroll Baby Larry, he is not eligible for tribal membership and is

therefore not an Indian child within the meaning of the ICWA.[4] Although the question is not free from doubt and other courts have ruled that children such as Baby Larry are not Indian children within the meaning of the ICWA, *see, e.g. In re Appeal in Maricopa County*, 136 *Ariz.* at 533, 667 *P.*2d at 233, we feel that, given the procedural posture of this case, the tribe's current refusal to enroll Baby Larry is not determinative of his status as an Indian child under the ICWA.

Unlike Wright's status as a parent under ICWA, discussed *infra*, which involves a legal determination, we are satisfied that Congress intended that a child's eligibility for tribal membership be a question of fact dependent on his or her actual ancestry. Since Baby Larry's ancestry is in dispute, a definitive resolution of his status as an Indian child would thus require an evidentiary hearing. We find it unnecessary to resolve this factual question, however, because even if Baby Larry is an Indian child, petitioners' challenge under the Act fails on other grounds.

## III.

Before Wright can take advantage of the procedures provided by the Act, he must first satisfy its definition of "parent." Under the ICWA, "parent" is defined as

any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. *It does not include the unwed father where paternity has not been acknowledged or established.* [25 *U.S.C.* § 1903(9) (emphasis added).]

The significance of this statutory definition is that unless Wright's paternity had been acknowledged or established prior to the final entry of judgment of adoption and termination of parental rights, he was not a parent entitled to notice pursuant to the provisions of § 1912(a). Furthermore, because the right

---

[4]The Appellate Division, approaching this issue from a slightly different tangent, concluded that the trial court was not in error in not applying the Act since at the time of the final judgment of adoption it had no reason to believe that Baby Larry was an Indian child. *In re Adoption of A Child of Indian Heritage,* 219 *N.J.Super.* at 40.

to challenge state custody proceedings is extended to a "parent," pursuant to § 1914, Wright does not even have standing under the Act unless his paternity has been acknowledged or established. Although petitioners contend that Wright's alleged claims of paternity to members of his family prior to the birth of the child constitute an acknowledgement of paternity under the ICWA, we disagree. We conclude that Wright's claims of paternity under the circumstances do not constitute the acknowledgement required under the Act.

The Act itself provides no express standards with respect to how an unwed father can acknowledge or establish paternity. Furthermore, the interpretative guidelines promulgated by the Bureau of Indian Affairs do not even discuss the problem of determining paternity. *See* 44 *Fed.Reg.* 67,583 (1979). The only indication of the legislative intent behind the Act's definition of "parent" is contained in the House Report on the Act, which states that the qualification of an unwed father's right "is not meant to conflict with the decision of the Supreme Court in *Stanley v. Illinois,* 405 *U.S.* 645, [92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972)]." *H.R.Rep. No.* 1386, *supra,* at 21, *reprinted in* 1978 *U.S.Code Cong. & Ad. News* at 7543. Hence, the legal principles surrounding this decision are instructive.

At common law, an unwed father had no parental rights. In *Stanley,* however, the Supreme Court found that a blanket denial of parental rights to all unwed fathers regardless of their fitness as parents violates the due process clause of the fourteenth amendment. *See Stanley,* 405 *U.S.* at 657–58, 92 *S.Ct.* at 1215–16, 31 *L.Ed.*2d at 562. In a series of cases over the next decade, the Court sought to define under what circumstances a state could deny an unwed father parental status. *See Lehr v. Robertson,* 463 *U.S.* 248, 103 *S.Ct.* 2985, 77 *L.Ed.*2d 614 (1983) (upholding denial of parental rights to an unwed father who had failed to establish a substantial relationship with his child); *Caban v. Mohammed,* 441 *U.S.* 380, 99 *S.Ct.* 1760, 60 *L.Ed.*2d 297 (1979) (according constitutional protection to unwed father who had sustained a relationship with his

children); *Quilloin v. Walcott*, 434 *U.S.* 246, 98 *S.Ct.* 549, 54 *L.Ed.*2d 511, reh'g denied, 435 *U.S.* 918, 98 *S.Ct.* 1477, 55 *L.Ed.*2d 511 (1978) (denying constitutional protection to unwed father who had manifested only limited interest in his children); *see also* Comment, "Delineation of the Boundaries of Putative Father's Rights: A Psychological Parenthood Perspective," 15 *Seton Hall L.Rev.* 290 (1985) (analyzing this line of authority).

The synthesis of these opinions is clear: "[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Lehr*, 463 *U.S.* at 260, 103 *S.Ct.* at 2992, 77 *L.Ed.*2d at 626, quoting *Caban*, 441 *U.S.* at 397, 99 *S.Ct.* at 1770, 60 *L.Ed.*2d at 310 (Stewart, J., dissenting) (emphasis added in *Lehr* deleted). Therefore, states may constitutionally deny an unwed father parental status unless and until he manifests an interest in developing a relationship with that child, provided that the qualifications for establishing such rights are not beyond the control of an interested putative father to satisfy. *Lehr*, 463 *U.S.* at 264, 103 *S.Ct.* at 2995, 77 *L.Ed.*2d at 628. Following the Court's decision in *Stanley*, many states adopted statutes defining the circumstances under which a man would be presumed to be a child's father and thus be entitled to due process in any proceeding involving the child.

The New Jersey Parentage Act, *N.J.S.A.* 9:17–38 to 59, patterned after the 1973 Uniform Parentage Act (which has since been adopted by approximately fifteen states, see *N.J.S. A.* 9:17–38) is representative, presuming a man to be a child's father if, for example, he has married the mother, or supported the child or taken the child into his home while openly holding out the child as his natural child. *N.J.S.A.* 9:17–43. In cases where circumstances beyond the father's control have made it impossible to establish an actual relationship with the child, the Act makes provisions for the unwed father to protect his legal status by filing a written acknowledgement of paternity, *N.J.S. A.* 9:17–43a(6), or initiating a legal proceeding to claim paterni-

ty, *N.J.S.A.* 9:17–43(d). The provisions in states that have not adopted the Uniform Parentage Act are substantially similar. *See, e.g. NY Dom.Rel.Law* § 111; *S.D. Codified Laws Ann.* §§ 25–6–1, 25–6–1.1. The constitutionality of such statutory schemes was upheld in *Lehr*, which held that an unwed father who failed to satisfy any of the status provisions of the New York law and who had also failed to take advantage of the statewide "putative father registry" established by New York was not entitled to notice of his child's adoption. *Lehr*, 463 *U.S.* at 265, 103 *S.Ct.* at 2995, 77 *L.Ed.*2d at 629.

■ These developments in the law were occurring contemporaneously with the hearings, reports, and eventual adoption of the ICWA in 1978, and appear to be reflected in the Act itself. Rather than establish a uniform rule recognizing all biological parents as parents, Congress instead included in the ICWA a definition of "parent" that excludes unwed fathers who have not taken affirmative steps to ensure that their relationship with their child would be recognized. This approach to the status of unwed fathers is consistent with the development of state law with regard to unwed fathers that was occurring as a result of the *Stanley* decision. In light of this, and the failure of either the Act or its interpretive regulations to prescribe or define a particular method of acknowledging or establishing paternity, we infer a legislative intent to have the acknowledgment or establishment of paternity determined by state law.[5]

---

[5]Such an interpretation is not unprecedented. In determining the meaning of "children" in the inheritance provisions of the Copyright Act of 1947, 17 *U.S.C.* § 24, for example, the Supreme Court observed:

The scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be determined by state, rather than federal law. [citations omitted]. This is especially true where a statute deals with a familial relationship; there is no federal law of domestic relations, which is primarily a matter of state concern.

... We think it proper, therefore, to draw on the ready-made body of state law to define the meaning of the word "children" in § 24. This does not mean that a State would be entitled to use the word "children" in a way

Courts of other states have also looked to state law to determine whether an alleged father of an Indian child has acknowledged or established paternity. *See, e.g., In re Appeal in Maricopa County, supra,* 136 *Ariz.* at 533, 667 *P.*2d at 233; *In re S.A.M., supra,* 703 *S.W.*2d at 607 n. 4; *In re Adoption of Baby Boy D, supra,* 742 *P.*2d at 1064; Furthermore, the ICWA's definition of parent looks to state or tribal law to determine the status of adoptive parents, 25 *U.S.C.* § 1903(9); *In re Adoption of K.L.R.F., supra,* 356 *Pa.Super.* at 560–61, 515 *A.*2d at 36 (adoptive mother recognized as "parent" within meaning of the ICWA), and also makes the determination of whether a person has legal custody of a child a question of state or tribal law. *See* 25 *U.S.C.* § 1903(6); *State ex rel. Juvenile Dep't v. England,* 292 *Or.* 545, 553–55, 640 *P.*2d 608, 613 (1982). We conclude, therefore, that Congress intended to defer to state or tribal law standards for establishing paternity, so long as these approaches are permissible variations on the methods of acknowledging and establishing paternity within the general contemplation of Congress when it passed the ICWA, *accord DeSylvia,* 351 *U.S.* 570, 581, 76 *S.Ct.* 974, 980, 100 *L.Ed.* 1415, 1428 (1956), reh'g denied, 362 *U.S.* 907, 80 *S.Ct.* 608, 4 *L.Ed.*2d 558 (1960), and provide a realistic opportunity for an unwed father to establish an actual or legal relationship with his child, *see Lehr,* 463 *U.S.* at 264, 103 *S.Ct.* at 2995, 77 *L.Ed.*2d at 628.[6]

---

entirely strange to those familiar with its ordinary usage, but at least to the extent that there are permissible variations in the ordinary concept of "children" we deem state law controlling. [*DeSylvia v. Ballentine,* 351 *U.S.* 570, 580–81, 76 *S.Ct.* 974, 980, 100 *L.Ed.* 1415, 1427–28 (1956), reh'g denied, 362 *U.S.* 907, 80 *S.Ct.* 608, 4 *L.Ed.*2d 558 (1960).]

[6]The ICWA adopts a similar approach with respect to determination of a child's domicile. The Act contains no independent definition of domicile, an omission explained in the Bureau of Indian Affairs interpretative guidelines on the grounds that "definitions [of domicile] were not included because these terms are well defined under existing state law. There is no indication that these state law definitions tend to undermine in any way the purpose of the Act." 44 *Fed.Reg.* at 67,585. In *In re Adoption of Halloway, supra,* 732 *P.*2d

■ The procedures provided in the New Jersey Parentage Act provide more than an adequate means of determining when an unwed father's paternity has been acknowledged or established. The Parentage Act is patterned after the 1973 Uniform Parentage Act and is substantially similar to the New York putative father provisions upheld in *Lehr*. Furthermore, it should be noted that, as applied, the New Jersey statute provides greater protection for unwed fathers than the laws of many other states. For example, under New Jersey law, by petitioning a court for a declaration of paternity prior to the termination of his parental rights, the father in *Lehr* would have been entitled to notice of the pending proceeding to terminate his parental rights.[7] *R.* 4:5-1. In addition, unlike the result under the laws of other states, which allow adoptions to occur any time after birth, *see In re Adoption of Baby Boy D, supra,* 742 *P.*2d at 1073 (Kauger, J., concurring in part and dissenting in part), or require acknowledgements of paternity to

---

962, the Supreme Court of Utah, while acknowledging that Congress intended that state law control the determination of domicile in ICWA cases, refused to do so where the interplay of Utah law on domicile and parental abandonment, when applied to the particular facts of that case (an admittedly collusive attempt to circumvent exclusive tribal jurisdiction), resulted in a frustration of the purposes of the Act which would not have been in the contemplation of Congress when it enacted the ICWA. *See id.* at 968. The United States Supreme Court has granted review to determine, among other issues, whether domicile under the ICWA is defined by state or federal law. *In re B.B.,* 511 *So.*2d 918 (Miss.1987), juris. postponed *Mississippi Band of Choctaw Indians v. Holyfield,* —— *U.S.* ——, 108 *S.Ct.* 1993, 100 *L.Ed.*2d 225 (1988).

[7]Although *N.J.S.A.* 9:17–43 does not specify that filing a paternity action gives rise to a presumption of paternity, in our view such an action, upon notice to the other parties involved, is the substantial equivalent of filing a written notice of paternity for purposes of acknowledging paternity. *See N.J.S.A.* 9:17–43(d); *cf. Lehr,* 463 *U.S.* at 274, 103 *S.Ct.* at 3000, 77 *L.Ed.*2d at 634–35 (White, J., dissenting) (arguing that the father in that case had substantially complied with the New York statute by bringing suit even if he had not filed his claim of paternity). In practice, however, it would be rare for an unwed father to file a paternity suit without filing a written notice of paternity, since filing the notice entitles him to a presumption of paternity which must be rebutted by clear and convincing evidence to the contrary. *N.J.S.A.* 9:17–43b.

be made within a short period of time after birth, *see S.D. Codified Laws Ann.* § 25–6–1.1 (sixty days), a non-stepparent private placement adoption in New Jersey cannot be reduced to a final judgment until at least eight months after the child's birth. *N.J.S.A.* 9:3–48. We therefore find that New Jersey law provides an adequate, if not generous, means of acknowledging or establishing paternity.

■ Wright, however, failed to establish any of the presumptions of natural parenthood provided in *N.J.S.A.* 9:17–43. In addition, there is no indication that Wright ever filed a written acknowledgement of paternity, *N.J.S.A.* 9:17–43a(6), or initiated a lawsuit claiming paternity or any other parental rights prior to the final judgment of adoption. *See N.J.S.A.* 9:17–43d. Furthermore, despite the fact that he had again moved in with Baby Larry's mother within a month of her relinquishing custody of the child to the adoptive parents, Wright never attempted to enforce his paternal rights in South Dakota by either petitioning to enter his name on the child's birth certificate, *S.D. Codified Laws Ann.* § 25–6–1.1(2); *S.D. Codified Laws Ann.* § 34–25–13.2, or commencing any other proceeding claiming a parental right, such as visitation. *S.D. Codified Laws Ann.* § 25–6–1.1(3). Finally, Wright never filed an affidavit of paternity with the tribe or in any way attempted to exercise any right he might have had to establish his parental rights before the Rosebud Sioux Tribal Court.

Wright did not need notice of the Baby Larry adoption proceeding to take any of these steps; any unwed father concerned about protecting his parental rights would have taken one or more of these steps on discovering, as Wright did in September of 1984, that the mother no longer had custody of their child and that the child had been placed for adoption. Therefore, despite having the opportunity to do so for over nine months after the birth of the child, Wright failed to acknowledge or establish his paternity prior to the entry of the final

judgment of adoption, which terminated whatever parental rights to Baby Larry he may have had.

As the record in this case indicates, Wright failed to acknowledge or establish his paternity of Baby Larry prior to entry of the final judgment of adoption on May 24, 1985. In fact, he took no such action with respect to the child until May 23, 1986, twenty-one months after the child had been placed with his adoptive parents. Such action is not a timely acknowledgement of paternity within the contemplation of the ICWA.

Because the final judgment of adoption had been entered prior to the initiation of Wright's suit for custody, any right he has under federal law to invalidate Baby Larry's adoption for failure to comply with the ICWA must come from 25 *U.S.C.* § 1914. This section provides that:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of section 101, 102, and 103 of this Act [25 U.S.C. §§ 1911, 1912, 1913].

Standing under § 1914 is conferred on "any parent." As "parent" is defined by the ICWA, however, an unwed father is not a parent unless his paternity has been acknowledged or established under state or tribal law. Because Wright had not done so prior to the initiation of his custody suit on May 23, 1986, he was not a "parent" within the meaning of the ICWA and thus had no right to challenge the adoption under § 1914.

■ This interpretation of the Act is reinforced by the language of § 1914 itself, which further limits standing to challenge state-law terminations of parental right to parents "from whose custody such child was removed." Baby Larry's adoptive parents argue that since Wright never had *physical* custody of Baby Larry, he has no rights under § 1914, and several courts applying the ICWA have reached similar conclusions. *See, e.g., In re Adoption of Baby Boy L, supra,* 231 *Kan.* at 205–06, 643 *P.*2d at 175, *In re S.A.M., supra,* 703 *S.W.*2d at 608.

See also In re Adoption of a Child of Indian Heritage, supra, 219 N.J.Super. at 42 (indicating that the Appellate Division below would have interpreted "custody" to mean physical custody). While we conclude that Wright does not have standing under § 1914, the issue is not as simply stated as these cases and the language of the Act would indicate, since it appears that § 1914 is referring to legal, rather than actual physical, custody.

"Custody" is not a defined term under the ICWA. Furthermore, while one of the fundamental tenets of statutory interpretation is that a word or phrase should have the same meaning throughout the statute in the absence of a clear indication to the contrary, see, e.g., Perez v. Pantasote, Inc., 95 N.J. 105, 116 (1984), it would be improper to apply this maxim to the meaning of "custody" in the ICWA. As used in the ICWA, the phrase "custody" has something of a chameleon-like quality, with its meaning changing to adapt to a particular textual context. Compare 25 U.S.C. § 1912(f) (apparently using "custody" to refer to a parent's legal relationship with his or her child, see H.R.Rep. No. 1386, supra, at 22, reprinted in 1978 Code Cong. & Ad. News at 7545) with 25 U.S.C. § 1916 (referring to return of physical custody of an Indian child following a vacation of adoption pursuant to § 1914, see H.R. Rep. No. 1386, supra, at 24, reprinted in 1978 Code Cong. & Ad. News at 7547).

We disagree with the Appellate Division below, 219 N.J.Super. at 42, and other courts that have limited the scope of that section to cover only parents who at one time or another had actual physical custody of an Indian child. Not only would such a strict interpretation be contrary to the general approach to Indian legislation, which is liberally construed in favor of Indians seeking the benefits of protections of federal law, see, e.g., Byran v. Itasca County, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710, 723 (1976), it would preclude application of the Act to an entire class of fathers who were unable, due to circumstances beyond their control, such as imprisonment, mili-

tary service, or the mother leaving the jurisdiction, to assume actual physical custody of their children. *Cf. In re Adoption of Baby Boy L, supra,* 231 *Kan.* at 200–01, 643 *P.*2d at 173 (finding that the ICWA did not apply since the child's father never obtained physical custody, despite the fact that the father was unable to do so due to his incarceration in a state penal institution for the entire period between the birth of the child and the final judgment of adoption); *Kiowa Tribe of Oklahoma, supra,* 777 *F.*2d at 589 (upholding the judgment of adoption in *In re Adoption of Baby Boy L* from collateral federal attack). For this reason, we feel that the reference to "custody" in § 1914 refers to a parent's legal, rather than physical, relationship with a child.

This distinction, however, provides no basis for a claim by Wright, since he failed to establish his status as a parent under the Act prior to the entry of final judgment in Baby Larry's adoption. As noted previously, § 1914 limits standing under the Act to parents and custodians of Indian children "from whose custody such child was removed." Similarly, § 1912(f), the other section of the Act in which "custody" is used to define a legal rather than physical status, speaks in terms of "the *continued* custody of the child...." (emphasis added). It appears that Congress, in passing the ICWA, was concerned not so much with creating parental rights as protecting parental rights that had been recognized or established through legal provisions outside of the Act. Given the potency of the Act's provisions for overturning child placements involving Indian children, the decision to limit standing under the Act to those who have established a legally cognizable interest in the child is understandable, just as our own child custody laws set very low thresholds for standing and entitlement to notice, *see N.J.S.A.* 9:17–43d, *N.J.S.A.* 9:3–45, but require a greater affirmative showing on the part of an unwed father before he is entitled to a substantive presumption of paternity. *See N.J.S.A.* 9:17–43a.

Because Wright did nothing to establish even a legal relationship with Baby Larry prior to the final judgment of adoption, however, he is not a parent "from whose custody such child was removed" and therefore has no standing to challenge Baby Larry's adoption under § 1914. *See, e.g., In re Appeal in Maricopa County, supra,* 136 *Ariz.* at 533, 667 *P.*2d at 233, *In re Interest of S.A.M., supra,* 703 *S.W.*2d at 607, *In re Adoption of Baby Boy D, supra,* 742 *P.*2d at 1064 (denying an unwed father who had failed to establish paternity standing under § 1914). While an unwed father whose failure to establish paternity prior to a final judgment of adoption was due to an inadequacy in state-law proceedings for asserting his parental rights, rather than his own inaction, would not lose his rights under the Act, this is not the case here. Therefore, the only avenue available to petitioners [8] to challenge the adoption of Baby Larry is provided by state law.

## IV.

Although the ICWA provides no independent means by which Wright could establish his parental rights, he still has the same right to establish paternity and assert his parental rights as any other similarly situated unwed father would have under state law. Furthermore, we feel that while § 1914 does not provide any rights to Wright until he has established paternity, once he

---

[8]We agree with the Appellate Division, 219 *N.J.Super.* at 44, that denial of the extended family's motion to vacate the adoption was proper. The ICWA does not provide for intervention by extended family members after the entry of a final judgment of adoption. *See* 25 *U.S.C.* §§ 1911(c), 1914. Furthermore, while § 1914 does provide an Indian child's tribe standing to attack collaterally a final judgment in a child custody proceeding (provided of course that an Indian child is involved and the child is eligible for membership in the tribe challenging the adoption), the Rosebud Sioux Tribe has refused to do so in this proceeding, and, considering the passage of time and the obvious prejudice that has resulted to both the adoptive parents and the child, any such action brought by the tribe in the future would be barred by laches. *See Moore v. Hafeeza,* 212 *N.J.Super.* 399, 406 (Ch.Div.1986) (dismissing an attempt to establish an unwed father's paternity on the grounds of laches).

has done so under state law he would be entitled to the rights provided by the Act. It is therefore necessary to determine what Wright must do in order to establish his parental rights for the first time after a final judgment of adoption.

The final judgment of adoption marks a turning point in the status of the natural and adoptive parents. In a voluntary private placement adoption such as is at issue here, the rights of the prospective adoptive parents are limited. Prior to a final adjudication terminating the natural parents' rights, there can be no expectation on the part of the adopting parents that the legally tentative decision to place the child for adoption will not be revoked. *See A.L. v. P.A.*, 213 *N.J.Super.* 391, 397 (App.Div.1986), certif. denied, 107 *N.J.* 110 (1987). The natural parents' consent in such circumstances is legally ineffective and their rights remain intact and enforceable unless or until there is a judicial determination that they have forsaken their parental obligations. *See Sees v. Baber, supra,* 74 *N.J.* at 210. This is a formidable burden. *In re Baby M, supra,* 109 *N.J.* at 445 (adoption may not be granted unless the parental rights of natural parent have been terminated as a result of neglect or abandonment); *cf. New Jersey Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591 (1986) (state must show by clear and convincing evidence that a child's health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change or is in some way incapable or unwilling to care for the child). Therefore, prior to the entry of the final judgment of adoption, the pending adoption proceedings posed no obstacle to Wright's ability to establish his parental rights, and he could have done so by filing an affidavit of paternity or initiating a proceeding claiming a parental right. *See N.J.S.A.* 9:17–43a(6), 9:17–43d.

Once a court determines that the natural parents of a child have forsaken their parental rights and a final judgment of adoption has been entered, however, there is a change in the status of the parties involved. Entry of such a judgment

terminates all relationships between the adopted child and his natural parents and all of the rights, duties, and obligations of any person that are founded on such relationships, *N.J.S.A.* 9:3–50(a), including any inchoate right of a biological parent to develop such a relationship. *See Sorentino II, supra,* 74 *N.J.* at 324. After a final judgment of adoption, the adoptive parents are, in the eyes of the law, the parents of that child as if the child had been born to the adoptive parents in lawful wedlock. *N.J.S.A.* 9:3–50b. Therefore, before attempting to establish his own rights as a parent, Wright must first vacate the judgment that found, in effect, that Baby Larry had been abandoned by his natural parents, *cf. In re Baby M, supra,* 109 *N.J.* at 446–47 (finding that the mother in that case had not forsaken her parental rights), and that recognized the adoptive parents as the legal parents of the child.

Under New Jersey law, any final judgment, including a judgment of adoption, may be challenged on the grounds of fraud, misrepresentation, or other misconduct of an adverse party, as long as such a motion is made within a reasonable time not more than one year after the entry of judgment. *R.* 4:50–1, 4:50–2.[9] Such a motion for vacation of judgment is addressed to the sound discretion of the trial court, whose resolution of the motion will not be disturbed on appeal unless it results from a clear abuse of discretion. *Hodgson v. Appelgate,* 31 *N.J.* 29, 37 (1959). The few New Jersey cases that have addressed this question have observed that public policy dictates that a judgment of adoption should be revoked only in light of very unusual facts and circumstances, *see, e.g., In re Adoption of O,* 88 *N.J.Super.* 30, 36 (Cty.Ct.1965), and that the court's discretion should be exercised in light of the best interests of the child. *In re Adoption of G,* 89 *N.J.Super.* 276,

---

[9]In light of our resolution of the other issues in this appeal, we need not consider whether a challenge to an adoption brought more than eleven months after entry of final judgment and twenty-one months after placement of the child with his adoptive parents was made within a reasonable period of time.

281 (Cty.Ct.1965). In light of the relegation of this question to judicial discretion, defects in a final judgment of adoption do not render the adoption void *per se*, but merely voidable. *See, e.g., In re Estate of Neuwirth*, 155 *N.J.Super.* 410, 420 (Cty.Ct. 1978); *see also Walter v. August*, 186 *Cal.App.*2d 395, 398, 8 *Cal.Rptr.* 778, 779 (1960) (applying the same rule under California law); *cf. In re Adoption of Child by I.T. and K.T.*, 164 *N.J.Super.* 476, 484 (App.Div.1978) (trial court not compelled to deny adoption merely because child was the subject of an illegal adoptive placement).

Since the trial court ruled that the adoption was not the result of fraud, a finding affirmed by the Appellate Division, 219 *N.J.Super.* at 43, our review in this case is limited to whether the trial court's decision amounts to an abuse of discretion. Wright alleges two possible grounds of fraud: the failure of the adoptive parents to provide him notice of the proceedings, and the concealment from the court that an Indian child was the subject of the proceedings. We find that both of these allegations lack substantial merit, since neither appears to have been a material factor in Wright's failure to establish his parental rights. We therefore agree with the Appellate Division that the trial court's refusal to give credence to them does not amount to an abuse of discretion.

■ Turning first to the question of notice, in light of the fact that the natural mother is unable to identify the child's father, *see N.J.S.A.* 9:3–45d, and Wright had failed to allege paternity in any legally cognizable form, it is questionable whether Wright was a putative parent entitled to notice under *N.J.S.A.* 9:3–45. Even assuming he was entitled to such notice on the basis of the adoptive parent's disclosure to the court that Wright had at some point made an allegation of paternity to them, the adoptive parents presented evidence establishing that the notice requirements of *N.J.S.A.* 9:3–45c had been substan-

tially met,[10] and in fact the trial court found that Wright had notice of the preliminary hearing. Wright's challenge to this evidence, his claim that the only document he received was a consent-to-adoption form from Better Living Services, was dismissed by the trial court, which found that it was impossible for Better Living Services to have sent such a form.[11]

Furthermore, we must return to the most significant fact in this appeal: despite the fact that he was living with Baby Larry's mother within a month of the child's birth and that he knew that the child had been placed for adoption, Wright failed for twenty-one months to take advantage of any of the means of protecting his parental rights provided by federal, state, or tribal law. Then, without receiving any more information than Wright had in his possession in September 1984, lawyers of the Association of American Indian Affairs in New York, acting on Wright's behalf, were in communication with the Middlesex County Surrogate's office inquiring about this case by name within a week of Wright contacting legal services in South Dakota in January of 1986. In light of this, we cannot see how any deficiency of notice in September of 1984 materially affected Wright's actions, and conclude that the trial court's refusal to vacate the adoption on these grounds was not an abuse of discretion.

---

[10]*N.J.S.A.* 9:3–45c provides that if personal service cannot be effected, notice by certified mail, accompanied by inquiries to the parent's known relatives and local governmental entities and organizations, is sufficient. Given the subsequent history of this case, we cannot see how failure to, for example, contact the motor vehicle agency in South Dakota sufficiently prejudiced Wright to warrant overturning a three-year old judgment of adoption.

[11]We find equally implausible Wright's alternate version of events urged on appeal: that the adoptive parents' attorney mailed him a consent form without a cover letter or notice of hearing. In light of our conclusion that, given the facts of this case, any defect in notice did not materially prejudice petitioner's rights, however, we need not comment on the trial court's finding, based on conflicting affidavits, that Wright received actual notice of the preliminary hearing.

■ We also find no abuse of discretion in the trial court's refusal to vacate the adoption on the grounds that the adoptive parents or their attorney knew the child was an Indian child and concealed this knowledge from the court. Wright claims that had this fact not been concealed from the court, the court would have known to follow the procedures of the ICWA. While we agree with Wright that there are aspects of this adoption that raise questions of fact about the good-faith behavior of the adoptive parents' attorney, under the circumstances of this case we find that any concealment of the child's potential Indian heritage did not materially affect petitioner's rights.

The facts relevant to this claim are that Baby Larry, prior to his birth, had been the potential subject of an adoption proceeding by a New York couple, and in relation to that adoption some research on Indian law was performed by lawyers in South Dakota at the request of the New York couple's attorney. For reasons undisclosed in the record, the New York couple decided not to proceed with the adoption, and Baby Larry was eventually placed with respondents, who at the time were represented by another attorney. Although respondents were aware of the New York proceeding, it was not until after the final judgment of adoption that their attorney attempted to get respondents to pay for any of the costs of the proceedings, which they refused to do, and it was not until after the commencement of this proceeding that they learned that the bill for legal services had been for research on Indian law.

We agree with the Appellate Division that at the time of the final judgment of adoption the trial court neither knew nor had reason to know that Baby Larry might be an Indian child.[12]

---

[12]The Bureau of Indian Affairs interpretative guidelines list as one of the circumstances in which a court has reason to believe an Indian child is involved is when an officer of the court involved in the proceeding has knowledge that the child may be an Indian child. 44 *Fed.Reg.* at 67,586. In light of the Bureau's reluctance to make their own guidelines binding, and our

219 *N.J.Super.* at 40. In the context of Wright's current motion to set aside the adoption, however, the relevant questions are whether this lack of knowledge was due to any misrepresentation on the part of the adoptive parents or their attorney, and whether such misrepresentation, if in fact a misrepresentation did occur, was a material factor leading to the loss of Wright's parental rights.

On the record of this case as it currently stands we would be inclined to find that no misrepresentation was involved. It does not appear that the natural mother ever disclosed that she was an enrolled member of the Rosebud Sioux Tribe or that Wright was even the father of the child. There was thus even less information available on whether Wright was an Indian and absolutely no information about whether Wright was of sufficient Indian blood to make the child eligible for tribal membership. Furthermore, the pre-adoptive report of Better Living Services indicated that both the mother and the child are Caucasian. Therefore, there is more than adequate evidence from which a court could infer that in informing the trial court of Wright's name and address, respondent's attorney at the time of the adoption had made full disclosure of any information he had concerning the child's heritage. On the other hand, what their attorney knew about the New York adoption at any particular time is open to dispute. In light of the ambiguity surrounding the New York proceedings, without an evidentiary hearing we would not be prepared to say no misrepresentation took place.

· Such a hearing, however, is unwarranted. Even assuming the attorney had indications of the child's potential Indian

_____

own doubts as to whether the proposed guidelines accurately reflect Congress' intent when it revised § 1912a to require notice to the tribe when the court had constructive knowledge that an Indian child was involved, *see H.R.Rep. No. 1386, supra,* at 21, *reprinted in* 1978 *Code Cong. & Ad. News* at 7544, we decline to follow the guidelines where the result would be that any knowledge attributable to any attorney in a case that an Indian child may be involved would be attributable to the court as knowledge that an Indian child is involved.

heritage and willfully failed to disclose them to the court, there is no indication that the court's lack of knowledge prejudiced Wright in any way. Since he had failed to acknowledge or establish his paternity, he still would not have been entitled to notice under the Act, and whether or not he or the child was an Indian would have no effect on his right to notice under state law. Furthermore, the "reason to know" standard of § 1912(a) applies only to notice; the higher substantive standards governing termination proceedings of § 1912(f) would not be applicable unless it was established that an Indian child in fact was involved. The trial court could not have applied these standards until Wright laid some legal claim to Baby Larry, which, as we have repeatedly said, he failed to do. We also note in passing that if Wright had been even remotely vigilant in protecting his parental rights, *he* would have been in a position to inform the court of the child's potential Indian heritage. In light of these factors, we cannot say that this case would have proceeded any differently if the court had been informed in September of 1984 that Baby Larry might be an Indian child. Therefore, the trial court did not abuse its discretion when it refused to vacate the adoption on the grounds of fraud.

Finally, it is necessary to address petitioners' claim that the Appellate Division opinion creates an irrebuttable presumption that after a certain period of time it is in a child's best interests to remain with those who have present custody. As we read the opinion below, no such presumption was created. The comments of the Appellate Division were in the context of a discussion of the factors to be considered in a court's exercise of discretion to vacate a judgment of adoption. 219 *N.J.Super.* at 43. Since Wright did nothing of legal significance to assert his parental rights during the first twenty-one months of the child's life, the primary focus of the trial court's inquiry was whether there were any factors that would excuse the natural father's neglect of his rights and obligations as a parent. In such an inquiry, given the longstanding judicial, *see, e.g., In re Adoption of G, supra,* 89 *N.J.Super.* at 281, and

legislative, *see N.J.S.A.* 9:3–37, admonition that child custody proceedings should be conducted to promote the best interests of the child, we cannot see how consideration of the possible impact of vacating the adoption of the child is improper. Furthermore, although we would caution any court from attempting to quantify such harm, a determination that there would at least be some short-term harm to a three (now four) -year old child if he were to be removed from his parents and moved more than a thousand miles to a different culture represents a permissible exercise of common sense and experience, *see Evid. R.* 12(2) (judicial notice in proceedings subsequent to trial) rather than judicial usurpation of psychological expertise.

The fact that such harm exists becomes important when, as respondents have alleged, the application of laches is an issue. Laches attaches where there is an unexplained and inexcusable delay in enforcing a known right, and prejudice has resulted to the other party because of such delay. *See Moore, supra,* 212 *N.J.Super.* at 406. In cases such as this, the doctrine of laches establishes an appropriate framework for reviewing the exercise of a court's discretion to vacate a final judgment of adoption. Wright waited twenty-one months before attempting to assert his parental rights, and even assuming he did not receive notice of the adoption proceeding, this would not explain his failure to do anything during this time despite the fact that he knew the mother had placed the child for adoption. The trial court, confronted with an unexplained and apparently inexcusable delay, then sought to determine if this delay, both prior to and after the final judgment of adoption, had resulted in any prejudice to the other parties involved.

We have on many occasions had reason to consider the prejudice to the child and adoptive parents caused by the failure of natural parents to be vigilant in the protection of their parental rights. In *Sorentino II,* for example, we observed of a one-year delay in asserting parental rights:

A foreseeable result from that delay was that the child would become firmly established in her adoptive home. Such equivocation and indecision on the part of the natural parents, with predictable consequences, are harmful to the well-being of the child and are relevant in the consideration of the issue of abandonment and termination. [*Sorentino II,* 74 *N.J.* at 324.]

If consideration of such factors is proper in the context of an initial determination of abandonment and termination, there can be no question of the propriety of considering such factors when the issue is whether to vacate a judgment that found, on the basis of uncontroverted evidence, that Wright by his inaction had failed to vindicate his parental rights. Under the circumstances of this case, while we cannot say on the record before us that the adoption at issue conformed in all respects to the requirements of state law, we are confident that the trial court's decision not to vacate the adoption was well within the scope of its discretion. *See, e.g. Moore, supra,* 212 *N.J.Super.* at 406; *Rodriguez v. Koschny,* 57 *Ill.App.*3d 355, 14 *Ill.Dec.* 916, 373 *N.E.*2d 47 (1978) (refusing to vacate a judgment of adoption due to laches).

## V.

In conclusion, we feel compelled to add that this result does not diminish the protection the Act was intended to provide to the parents of Indian children. In the typical ICWA case, the parental rights of the party attempting to invoke the Act will not be an issue. The Act primarily was enacted to provide Indian parents with sufficient leverage to resist involuntary or induced voluntary placements of their children. *See H.R.Rep. No.* 1386, *supra,* at 9, *reprinted in* 1978 *Code Cong. & Ad. News,* at 7531. In the great majority of ICWA cases, brought by married or divorced parents, adoptive parents, or single mothers, establishment of paternity will not be a problem. Even in the relatively few cases brought by unwed fathers, the requirement that a parent have at one time had legal rights to the child will not be an issue where the father has acknowledged paternity, either prior to removal of the child or in the interim between removal of the child and termination of the

father's parental rights. *See, e.g., In re Angus,* 60 *Or.App.* 546, 655 *P.*2d 208 (1982), review denied sub nom. *Angus v. Joseph,* 294 *Or.* 569, 660 *P.*2d 683, *cert.* denied sub nom. *Woodruff v. Angus,* 464 *U.S.* 830, 104 *S.Ct.* 107, 78 *L.Ed.*2d 109 (1983). The Act provides Indian parents the right to challenge even a final judgment of adoption in situations where a non-Indian would have no right to complain; it is only Wright's unexcused delay in establishing his rights as a parent that prevents him from taking advantage of the benefits provided by the Act.

For the reasons stated above, the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*Opposed*—None.