ESTHER ARREQUIN RODRIGUEZ, Plaintiff-Appellant, *v.* MARIE KOSCHNY *et al.*, Defendants-Appellees.

Second District   No. 77-219

Opinion filed February 15, 1978.

John B. Kincaid, of Mirabella, Facktor, Mirabella & Kincaid, of Wheaton, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton, and Gerald Cohen and John J. Casey, both of Chicago (Edmund P. Bart, Assistant State's Attorney, of counsel), for appellees.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Esther Arrequin Rodriguez is the natural mother of a child born in 1966 who was adopted by the defendants Robert J. Klaeren and Joan L. Klaeren in 1968 following an order which terminated parental rights. In those proceedings the mother was served by publication as "unknown." In 1975 the mother instituted habeas corpus proceedings in Cook County in the course of which she located the child living with the Klaerens. In

1976 the mother filed a petition pursuant to section 72 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 72) to vacate the order which terminated her parental rights, the order authorizing a guardian to consent to the adoption, and the decree of adoption. Following an evidentiary hearing her petition was denied and she appeals.

The child was born on April 1, 1966, at Weiss Memorial Hospital in Chicago. Miss Rodriguez left the hospital on April 9, 1966, with the baby and with her older sister Marie Koschny. Later that day by pre-arrangement Marie Koschny delivered the child to Martha D. Chauvet, a medical doctor.

On December 28, 1967, after the Klaerens had custody of the child for over a year, a petition was filed with the State's Attorney for Du Page County alleging that "Baby Boy Doe" was born on April 2, 1966,[1] and was a dependent minor without a parent or a legal guardian. The petition was verified by affidavit and stated that the child's mother was "unknown." Notice by publication was made "To All Whom it May Concern" on January 24, 1968, pursuant to section 4—4(2) of the Juvenile Court Act (Ill. Rev. Stat. 1967, ch. 37, par. 704—4(2)). Pursuant to the notice the court, on January 28, 1968, terminated the mother's legal rights with respect to the child and appointed the deputy chief probation officer of the county as guardian with the power to consent to adoption.

On March 26, 1968, the Klaerens filed a petition to adopt Baby Boy Doe alleging that the mother was an unfit person on the grounds of abandonment. Thereafter, on June 3, 1968, the court entered a decree of adoption pursuant to the written consent of the guardian.

Miss Rodriguez filed a petition to vacate the various orders on February 25, 1976. Her petition alleged that she first acquired actual knowledge of the whereabouts of her child on August 4, 1975; that she did not receive notice of the proceedings to terminate her parental rights; and concluded that therefore the various orders and the decree of adoption were void.

In the evidentiary hearing held on the petition, the petitioner testified that her sister Marie picked her up at the hospital; that they drove with the baby to the north side of Chicago; that her sister then suggested that petitioner place the baby in the front seat and lie down on the back seat to prevent her feet from swelling; but that before she could open the rear door to get into the back her sister drove away. Petitioner testified further that she ran behind the car, waited on the corner a few minutes in the belief that her sister did not know that she was still outside the car and when her sister failed to return went home.

The remainder of petitioner's testimony is primarily her account of how over a period of nine years she had attempted without success to gain

[1] As previously indicated the birth certificate showed a date of April 1, 1966, but the trial court found that this was the same child who had been born to the plaintiff.

information about the child by questioning her sister Marie. Among other things she testified that after petitioner left the hospital she attempted to call Marie at her Chicago residence but got no response and that Marie refused to return her calls. She said that on occasions Marie would telephone the house where petitioner lived and petitioner would demand to know the whereabouts of the baby. On these occasions Marie would say "Oh, he is fine" and nothing further. On another occasion Marie said "He is well, he eats well. He doesn't cry." On another occasion Marie told her "Oh, he is starting to roll over. He eats real well, he is gaining weight * * * He is on orange juice now." Later Marie would tell petitioner that the child climbed up and down in the high chair. Petitioner testified that in 1970 Marie told her that the child was old enough to be in Montessori School and was learning three languages and cultures. Also, according to petitioner, Marie from time to time accepted money and clothing which was purportedly for the benefit of petitioner's child. Miss Rodriguez testified that often when she would demand to have her baby back Marie would give no answer whatsoever. In 1969 Marie was driving petitioner to Champaign and Miss Rodriguez testified that she tried to talk to her in regard to the baby but she got the answer that Marie did not wish to be distracted while she was driving. Petitioner recounted several instances when she would visit Marie at her sister's house and on these occasions would notice that the baby was not with her sister. She said on occasion she even took care of Marie's little girl and would say that she could take care of two as well as one and asked to have the child with her on weekends. She said that in 1970 she asked on an average of at least once a week about the child. Petitioner also testified that in 1971 she asked Marie where the child was and asked if he was with nuns in Peoria or in Kankakee or what was going on and that Marie refused to answer; and on another occasion asked to see him, to see what was going on and that Marie refused to answer.

When counsel asked petitioner why she accepted these incomplete explanations she replied, "We are Mexican-American and we live in the extended family form." She also said there was a history in the family of caring for nephews and nieces and that Marie was the head of the household and made the family decisions.

Petitioner testified that she finally filed a petition for writ of habeas corpus in Cook County on July 25, 1975, seeking to require Marie to answer questions as to the whereabouts of the child as a result of which she located the child. She said she waited until July 25, 1975, to institute legal proceedings because she trusted her sister. Only after she talked to a priest, she said, did she feel free to bring suit against her sister.

Marie Koschny, however, testified that shortly before the baby was born petitioner approached her for help and stated "Can you keep it. Can

you put it in a foster home for me"; and that Marie answered that the child should be "placed" and explained that she thought her sister understood that that meant placing the child for adoption because there was no other way of caring for the child; but she said that she did not use the word adoption and neither did Miss Rodriguez. However, she said "It was understood." Marie also testified that she had never told the petitioner that the child had been adopted because she could not be that "blunt" with her. Marie testified that petitioner was in the back seat of the automobile when the baby was delivered to Dr. Chauvet and that afterwards she and her sister drove to the family house together. Marie also testified that both she and petitioner were living at the family residence in Chicago together until January 1967. Further she said that petitioner lived with her in Champaign during the academic year 1969-1970. Marie admitted that petitioner occasionally brought up the subject of the child and that she told her sister that the baby was being well cared for but she denied that she ever led petitioner to believe that she was caring for the child.

Dr. Chauvet testified that Marie contacted her before the baby was born with reference to an adoption and that on Marie's request she arranged for a meeting between Marie and Mrs. Klaeren. She also testified that she took the child to the Klaerens' home. She said that Marie at no time told her the mother's name.

There was further evidence in the record that petitioner was nearly 39 years old when she gave birth to the child; that she was a highly educated woman with a bachelor of science degree in nursing and a master's degree in education, as well as substantial postgraduate credit in medical and physical care. She was unmarried and at the time she gave birth to the child she had a job in which her duties included giving formal lectures and conducting seminars for undergraduate students in nursing.

During the course of the section 72 hearing petitioner's counsel repeatedly attempted to show that there was little attempt to ascertain her name and address but objections were sustained to these questions. In an offer of proof petitioner's counsel stated that the notes of the person who was responsible for making the investigation for the Du Page County probation department had been destroyed by a flood.

The trial court directed a finding in favor of the adopting parents at the close of plaintiff's evidence on the basis that the petitioner had failed to comply with the equitable requirements of reasonable diligence, was guilty of laches, and had not complied with the two-year limitation of section 72. Petitioner contends that these findings were in error. She argues that she made a prima facie case that no adequate inquiry had been made as to her unfitness which was a prerequisite to the adoption under the statute (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—1(d)) since she had

not consented to the adoption. She also contends that she was erroneously prevented from pursuing an inquiry into the failure to determine her whereabouts in the course of the adoption proceedings; and further argues that the two-year period provided by section 72 did not begin to run until she became aware of the adoption proceedings in the course of the habeas corpus suit in 1975 and that consequently her petition was not barred.

■■ The allegation that petitioner did not receive notice of the adoption proceeding does not require the conclusion that the adoption decree was therefore void in the sense that it must be considered a nullity. The invalidity she claims does not appear on the face of the record. The record shows that there was substantial compliance with the provisions of the Adoption Act. (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—1 *et seq.*) The State's Attorney's petition to terminate parental rights alleges that the mother is "unknown"; notice was given by publication for unknowns in accordance with the statute; the court in the order terminating parental rights expressly found that the natural mother and father were both unknown and that the child was abandoned by both and is dependent on the public for support; and the adoption decree was entered upon the consent of the Department of Probation, appointed to consent upon the termination of parental rights. On this record the court acquired jurisdiction of both the subject matter and the parties and its judgment was presumptively valid.

■■ ■ The mother was, of course, thereafter not precluded from seeking to set aside the decree by a proper showing that she had been divested of her natural parental rights without an opportunity to be heard, and on that showing as to her the decree was voidable. (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—20. See also *Yockey v. Marion*, 269 Ill. 342, 350 (1915); *Sullivan v. The People*, 224 Ill. 468, 476 (1906).) A notice by publication is insufficient to afford due process with respect to an individual whose name and address is known or easily ascertainable. (*Robinson v. Hanrahan*, 409 U.S. 38, 34 L. Ed. 2d 47, 93 S. Ct. 30, 31 (1972). See also *Armstrong v. Manzo*, 380 U.S. 545, 14 L. Ed. 2d 62, 85 S. Ct. 1187, 1191 (1965).) Here, the written consent of the court appointed guardian specifies that the child was born at Weiss Memorial Hospital on a particular date. The mother should have been permitted under these circumstances to show that her name and address were easily ascertainable. The trial court erroneously foreclosed an inquiry directed at the adequacy of the notice by publication in that it directly bore on her right to avoid the judgment.

We nevertheless conclude on the record as a whole that the trial court properly denied section 72 relief based upon petitioner's laches. We cautiously note that we have found no Illinois authority which has

previously applied the doctrine of laches to preclude the assertion of parental rights. Yet we believe that the circumstances of this case illustrate the reasonable need to apply that equitable principle to prevent a serious disruption of a stable family unit which now involves not an infant but a 12-year-old child and his adoptive parents who have lived with him in a family relationship for a dozen years.

It has been noted:

> "The adoption decree is *sui generis* because it closely concerns the life of someone other than the contending parties, the child. A rule that an individual's right to set aside a judgment entered without jurisdiction over him cannot be cut off by lapse of time (assuming there is such a rule) does not and should not apply to the case where interests exist superior to those of the party whose rights are terminated." H. Clark, Domestic Relations §18.10, at 667 (1968).

There has been a legislative parallel in numerous States which has recognized the policy of denying to a parent who is not notified of adoption proceedings the right to wait indefinitely before attacking a decree of adoption. (See Annot., 83 A.L.R.2d 945 (1962).) It may also be noted that "[a]ll statutes of limitation are based on the theory of *laches*." (*Cross v. Janes*, 327 Ill. 538, 546 (1927).) The equitable doctrine of laches as judicially devised is therefore related in principle and in essential purpose to the special statute of limitation governing attacks on adoption decrees in effect in some States. Illustrative is the case of *Walter v. August*, 186 Cal. App. 2d 395, 8 Cal. Rptr. 778 (1960). The Walters had placed their six-week-old child in the custody of the Augusts. Subsequently the Augusts gained a court order declaring the child free of the custody and control of the natural parents and later were granted the right to adopt the child. The Walters had neither consented nor received notice of the proceedings. They filed an action to set aside the adoption decree more than five years after it had been entered and after the applicable statute of limitations had run. The appellate court found that the decree was voidable but that nonetheless the natural parents were barred from bringing the action after the statute of limitations had run. The court stated:

> "[T]he child had acquired a new status, both in fact and in law. His natural parents' obligations to him demanded that they care for and support him—which includes a clear obligation on their part to keep track of his whereabouts and his welfare. This they failed for a long time to do." 186 Cal. App. 2d 395, 399, 8 Cal. Rptr. 778, 780-81.

■■ Illinois cases recognize that even if service of process is defective an attack on a decree may be barred by laches. (See *James v. Frantz*, 21 Ill. 2d 377, 383 (1961).) It is a basic to the laches doctrine that a

complainant may be barred when, after ascertaining the facts, he fails promptly to seek redress. (*James v. Frantz*, at 383.) Actual knowledge of the specific facts upon which his claim is based is not a requirement. As stated in *Bobin v. Tauber*, 45 Ill. App. 3d 831, 837 (1977):

> "If the circumstances are such that a reasonable person would make inquiry concerning these facts, a party will be charged with laches if he fails to ascertain the truth through readily available channels."

See also *Simpson v. Manson*, 345 Ill. 543, 556 (1931).

■■ In the present case it is unreasonable to believe that petitioner did not know that her parental rights were subject to dispute. According to her own testimony she repeatedly confronted her sister demanding return of the child, asking to see him and to know his whereabouts. In view of her age, intelligence and education it seems incredulous that she would not be on notice that her parental rights were not recognized. It is even more incredulous that petitioner so trusted her sister Marie that she believed she had done nothing to jeopardize petitioner's parental rights when over a nine-year period her sister totally denied petitioner any information as to the child's whereabouts. And it is incredible that a woman seriously interested in regaining custody of her child would refrain from seeking legal enforcement of her parental rights over a nine-year period for fear of upsetting her own ethnic family relationship.

The failure to assert a known right and the lapse of time must work in conjunction with the circumstances to cause prejudice to the adverse party in order to support the doctrine of laches. (*Slatin's Properties, Inc. v. Hassler*, 53 Ill. 2d 325, 330 (1972).) We think, however, that the prejudice is quite obvious in this case. As aptly noted in *Walter v. August*, 186 Cal. App. 2d 395, 399, 8 Cal. Rptr. 778, 780 (1960), the child has acquired "a new status both in fact and in law." Since the time he was a little more than a week old the Klaerens have assumed the parental responsibilities of caring, feeding, clothing and sheltering the child. Disruption of the continuity of relationship between the child and his "psychological parents" is almost certain to adversely affect the child's development. (See Goldstein, Freud & Solnit, Beyond The Best Interests of The Child 31-37 (1973). See also *In re Adoption of J.S.R.*, 374 A.2d 860 (D.C. App. 1977); *Lloyd v. Schutes*, 24 Md. App. 515, 332 A.2d 338, 342-43 (1975).) In addition to a substantial investment of time and money the emotional commitment of the adoptive parents is understandably different from the commitment that the Klaerens would have made if the child were only temporarily in their custody. See Goldstein, Freud & Solnit, Beyond The Best Interests of The Child 22-26 (1973).

We also note that the long delay has made it practically impossible for a trial court to determine as an evidentiary matter whether petitioner's

name and address were easily ascertainable in 1968 when petitioner was given constructive notice by publication. The member of the probation department who was in charge of making the investigation into the whereabouts of the natural mother no longer has her written notes of the investigation because they were destroyed in a flood. Any evidence which would justify notice by publication must come solely from the officer's memory of an investigation made over 10 years ago. The facts as they existed at that time have become obscure and difficult to ascertain and in our judgment petitioner should not be allowed to gain an unfair evidentiary advantage because of her laches. *Carlock v. Carlock*, 249 Ill. 330, 339 (1911).

For the reasons which we have stated we therefore affirm the judgment of the trial court which denied section 72 relief to the petitioner.

■■ A subsidiary question has been raised with reference to the imposition of expenses for the fees and costs expended by the adopting parents in defending the proceedings assessed against petitioner by the trial court pursuant to section 41 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 41). We have examined the various allegations which the petitioner was charged with having made without reasonable cause and not in good faith and which the court found to be untrue. Even if the allegations were not believed by the trial court we find no reason to conclude on the record that they were made in bad faith. We therefore reverse the order imposing fees and expenses.

The order assessing the fee of the guardian ad litem against Petitioner, however, is affirmed as within the discretion of the trial court. Ill. Rev. Stat. 1975, ch. 22, par. 6; *Ackerman v. Elmont Lumber Co.*, 69 Ill. App. 2d 477, 482 (1966); *Merneigh v. Merneigh*, 2 Ill. App. 2d 352, 356 (1954).

Affirmed in part and reversed in part.

BOYLE and NASH, JJ., concur.