# Illinois Official Reports

## Appellate Court

---

### *In re Jamari R.*, 2017 IL App (1st) 160850

---

| | |
|---|---|
| Appellate Court Caption | *In re* JAMARI R., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Keith B., Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-0850 |
| Filed | June 8, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-JA-386; the Hon. Demetrios G. Kottaras, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Elizabeth Butler, of Northbrook, for appellant.<br><br>Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Jean M. Agathen, of counsel), guardian *ad litem*.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Michele Lavin, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HOWSE delivered the judgment of the court, with opinion.<br>Justices McBride and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following the trial court's entry of an order terminating the parental rights of the father of Jamari R., the father, Keith B., appealed that decision arguing that he had not been properly served prior to appearing in the proceedings where (1) the Department of Children and Family Services (DCFS) and the State did not conduct a diligent inquiry in locating him and (2) the State's service by publication listed the incorrect last name of Jamari and Jamari's mother. For the reasons that follow, we affirm the trial court's order terminating the father's parental rights and remand this matter to the trial court for further proceedings consistent with this opinion.

¶ 2    BACKGROUND

¶ 3    Jamari was born on May 21, 2007. On June 1, 2007, the State filed a petition for adjudication of wardship of Jamari. In that petition, the State incorrectly spelled the minor's name as "Jabari [Spelling 1],"[1] and incorrectly spelled the mother's name as "Shavelle [Spelling 1]" when it should have been spelled "Shavelle [Spelling 2]." The petition further stated that the father was unknown.

¶ 4    On June 1, 2007, the trial court conducted a temporary custody hearing. At that hearing, the mother's attorney informed the court and the parties that the mother's last name was "[Spelling 2]" not "[Spelling 1]." The attorney also informed the court and the parties that the child's last name was the same as the mother's last name, "[Spelling 2]." Later on during that hearing, the mother corrected the parties and the court that her son's first name was "Jamari" and not "Jabari." The parties, including the State, the mother, and the guardian *ad litem* (GAL), entered into a stipulation at that hearing, stating that Jamari's father's identity and whereabouts were unknown. The stipulation also indicated that Jamari and a child that the mother gave birth to two years prior to Jamari had both been born drug exposed and the mother had seven other minors who were or are in DCFS custody with findings of abuse or neglect. This stipulation was signed by the mother and her attorney.

¶ 5    On the same day, the trial court entered an order amending the petition for adjudication of wardship to show the correct spelling of Jamari's first and last names.

¶ 6    On June 14, 2007, an affidavit for service by publication was filed stating that the fathers of Jamari and his sibling were still unknown, so they could not be found. The caption of this affidavit had the incorrect spelling of Jamari's first and last names. On August 10, 2007, notice of the pending proceedings was printed in the Chicago Sun-Times; Jamari's name was misspelled as "Jabari [Spelling 1]" and his mother's name was misspelled as "Shavelle [Spelling 1]." This notice indicated that the adjudication hearing was set for August 24, 2007, or as soon thereafter as the case could be heard.

¶ 7    On August 24, 2007, the trial court held a status hearing on service by publication. The caseworker for the minor, Ms. Fries, stated that no one had come forth claiming to be the father. Fries also stated that she had done a Putative Father Registry search on August 17,

---

[1]Throughout the course of these proceedings, the parties misspelled the minor and the mother's last names numerous times. In order to keep the minor's identity private, we will refer to the incorrect spelling of the minor and the mother's last name as "Spelling 1" and the correct spelling of the minor and mother's last name as "Spelling 2."

2014, but there were no names of fathers in the results she received on August 21, 2014. Fries stated that when she had discussed the father with the mother, "she tends to tell me unknown."

¶ 8 When the State requested a default on the unknown fathers, one of the attorneys pointed out that there was a discrepancy in the minor's name, the correct spelling of which was "Jamari [Spelling 2]" but the publication wrote "Jabari [Spelling 1]." The State then asked for the correct spelling of the minor's name, was informed that it was "Jamari [Spelling 2]," and the trial court thereafter allowed the State leave to republish the notice. A second affidavit for service by publication was filed on August 29, 2007. This affidavit included the names "Jabari" and "Jamari" in the caption, with the correct spelling of "Jamari" as an "AKA." Jamari's last name and his mother's last name were both again incorrectly spelled as "[Spelling 1]." Publication with those spellings ran in the Chicago Sun-Times on October 19, 2007.

¶ 9 At the adjudication hearing on November 2, 2007, Fries testified that she had done a Putative Father Registry search in August of that year under Jamari's name, and there were no results. An affidavit of her due diligence concerning the Putative Father Registry search was admitted into evidence without objection. Jamari's first and last names were spelled correctly in the caption of the affidavit. On the State's motion, the unknown father of Jamari was defaulted. The adjudication hearing then proceeded by stipulation. It was stipulated that Jamari's father's identity and whereabouts were unknown, Jamari had been born exposed to illegal drugs, and the mother admitted to using illegal substances while pregnant. Based on the stipulated record, the trial court found that Jamari had been neglected due to his exposure to a controlled substance and due to an injurious environment. The court also found that Jamari had been abused due to a substantial risk of physical injury based on the mother's history of noncompliance with services, lack of prenatal care, and prior findings of neglect and abuse relating to other siblings.

¶ 10 The trial court held dispositional and permanency hearings on March 20, 2008, and September 18, 2008. On September 18, 2008, the court entered an order finding the mother and unknown father of Jamari were unable to care for him. The court made Jamari a ward of the court and placed him in the guardianship of the DCFS Guardianship Administrator. After several hearings on the parents' progress towards permanency goals, the trial court entered a permanency goal of termination of parental rights (TPR) for Jamari, and this permanency goal was entered numerous times thereafter.

¶ 11 On February 19, 2014, the State filed a "Supplemental Petition for the Appointment of a Guardian with the Right to Consent to Adoption" (TPR petition). The caption for this petition named Jamari as "Jabari [Spelling 1] AKA Jamari [Spelling 1] AKA Jamari Jamiel [Spelling 2]." The mother's name was listed as "Shavelle [Spelling 2]," and the father was listed as unknown. The petition alleged that it was in Jamari's best interest for his parents' parental rights to be terminated because he had been with his foster parents since December 13, 2012, and they desired to adopt him.

¶ 12 On April 4, 2014, a hearing on the TPR petition was held. At this hearing, the mother testified in response to the State's questioning that there was no one she wanted to name as Jamari's father. The trial court then inquired further, and the mother stated that the father could be James S. or "probably" Keith B. The mother then stated that Jamari's father could not be anyone else: "Nobody else. It's going to be one or the other." The court then granted the State leave to serve Keith B. The permanency hearing continued, and the court recommended a goal

of termination of parental rights, noting that Jamari was in an appropriate preadoptive home that could meet his long-term needs.

¶ 13    On June 19, 2014, the trial court entered an order for parentage testing on Keith B., and an attorney was appointed on his behalf.

¶ 14    On September 24, 2014, the trial court entered a finding that Keith B. was Jamari's father based on DNA testing. As a result, the court ordered that the TPR petition be amended to reflect Keith B. as the father.

¶ 15    On April 2, 2015, the State filed "Requests for Admissions of Facts" directed to the mother requesting that she admit that in addition to her name of "Shavelle [Spelling 2]," she used several other aliases at one time or another, including an alias with the last name "[Spelling 1]." The State also requested that the mother admit that she had convictions for four felonies, one under each of her aliases dating back to 1996.

¶ 16    On September 18, 2015, the trial court granted the State's motion to amend the TPR petition to add the ground of depravity for the father of Jamari. This motion also alleged that the father had been convicted of his fourth felony on June 29, 2015.

¶ 17    On October 8, 2015, the first hearing on the TPR petition was held. The mother was not present at this hearing, but the father was present. The father testified that he was currently housed at Danville Correctional Center. He had been incarcerated on May 10, 2013, sentenced on September 21, 2013, and was sentenced to six years at 85%. At this hearing, the State requested that the trial court take judicial notice of the adjudication order for Jamari entered on November 2, 2007, and the dispositional order entered on September 18, 2008. Further, the State's requests to admit to the mother were deemed admitted as she did not file a response.

¶ 18    Rakaia Johnson, Jamari's caseworker from March 2008 to August 2012, testified at the hearing, in relevant part, that she could not do a diligent search for Jamari's father because she did not know his name. She did perform Putative Father Registry searches, though, every six months, and no father ever popped up. No one claiming to be Jamari's father ever came forward, and Jamari's father was still unknown to her when she ceased being Jamari's caseworker in March 2012. Johnson stated that while she was assigned to the case, the mother was in jail on several occasions, and she had a difficult time keeping up with the mother because she used different aliases. With respect to the father, she testified that he had not made any progress towards reunifying with Jamari in four different nine-month periods beginning on August 13, 2009, and ending on August 16, 2012.

¶ 19    Jennifer Costello, Jamari's caseworker from August 2013 to September 2015, testified at the hearing, in relevant part, that when she was assigned the case, Jamari's father was unknown. She could not do a diligent search for the father because his name was unknown and nothing came up when she conducted a Putative Father Registry search. When Costello was assigned the case, the mother was incarcerated for retail theft, and she stated that the mother's biggest impediment to reunification was her continued arrests and incarceration.

¶ 20    Costello testified that on April 4, 2014, the mother identified Keith B. as a possible father. Keith B. was confirmed to be the father in September 2014, at which time the father was incarcerated. Costello spoke to the father via phone on January 16, 2015. The father told her that prior to the DNA testing, he had no knowledge that Jamari existed. He did not know he had a son with the mother, and he had not seen the mother in 10 years. The father told Costello that he was not in a position to be able to raise a child. During her conversation with the father,

Costello performed an integrated assessment with the father and determined he would need services such as individual counseling, a substance abuse assessment, and a domestic violence assessment. The jail where the father was at at that time did not have any of those services, and when the father was transferred to the Illinois Department of Correction (IDOC), the only service available was substance abuse service.

¶ 21 The father told Costello that he was not able to raise his daughter, whom he lived with before being incarcerated, much less other children. The father did not ask for visits with Jamari. While Costello was Jamari's caseworker, the father made no progress towards reunifying with Jamari, and he was not due for parole until 2020 based on an armed habitual criminal conviction. Costello testified that the father never engaged in any of his recommended services and never made progress towards reunification with Jamari while she was assigned to the case.

¶ 22 Costello testified that she had never spoken with Jamari about who his father was. Jamari's caregivers said they would do that in a therapeutic setting with Jamari's therapist. At the time of her testimony in October 2015, this had not been done.

¶ 23 An integrated assessment dated February 6, 2015, which was entered into evidence, stated that the father was 40 years old at the time Costello interviewed him. In 1995, when he was 20 years old, he moved in with a girlfriend and had two sons with her. He made his living selling drugs, and his girlfriend worked. He got a drug charge and went to the penitentiary. Several years later, he had a child with another woman and that child was born in January 2010. After he broke up with that girlfriend, he and the mother became friends and "hooked up" once. After that, the father moved in with the mother of the baby girl that was born in January 2010 and remained there until the girl was six years old, when he was incarcerated again.

¶ 24 On the State's request, the trial court then admitted into evidence certified statements of conviction for the mother under four different aliases as well as four certified statements of conviction for the father. The State and the GAL then rested.

¶ 25 The father testified on his own behalf. He was residing in Danville Correctional Center and had never met Jamari. He did not know about Jamari and never put his name into the Putative Father Registry. The father testified that his 1998 drug conviction was due to being the driver in a car with someone who had narcotics. His 2002 conviction was similar in that he was "standing around the neighborhood, and [he] was doing probation." His 2003 conviction was a firearm conviction in which he was caught with a firearm at a traffic stop and served a three-year sentence. He stated that he only "hooked up" with the mother once. The father rested, and the trial court continued the matter to another day so that the mother's attorney could locate her and have her appear.

¶ 26 On October 16, 2015, the mother was present and addressed the trial court and arguments were given. The State and the GAL argued concerning unfitness. The father's attorney argued that the father had not abandoned or deserted Jamari and that he never knew he had a son with the mother. The father's attorney went on to state: "When asked by the judge, the mother denied knowing who the father was. Neither of the caseworkers ever asked the mother who the father was. No diligent search was done because no father was named." In rebuttal, the State argued that the father was in a situation of his own making and that a lot of his convictions were based on previous convictions. According to the State, the father had three other children, and no connection with any of them. Following arguments, the court found that the mother was unfit by clear and convincing evidence on five grounds. Regarding the father, the judge asked

if there had been a decision in his pending appeal of a criminal conviction, as it could have a bearing on the TPR case. The judge set a hearing date of December 14, 2015, for status on the disposition of the appeal.

¶ 27    At the December 14, 2015, hearing, it was indicated that the father's release date was June 16, 2018, and that as of November 20, 2015, the appellate defender had not yet filed anything in the father's appeal. The judge stated that he would not wait for that. The court then inquired of the foster parents how Jamari was doing. The foster father reported that Jamari was doing extremely well. He was in the school choir, he had made the honor roll again, and DCFS had been very active in getting what the foster parents needed for him.

¶ 28    On February 29, 2016, another hearing was held and still nothing had been filed in the father's criminal appeal. After arguments, the judge stated that he was extremely sympathetic to the father's situation in that he had not been informed of his paternity. However, the judge stated that he would not wait any longer on the father's criminal appeal and found the father unfit.

¶ 29    A best interest hearing followed. At the hearing, Daisy Sanchez testified that she was Jamari's caseworker since September 14, 2015. Jamari had been in his current foster home for about 2½ years. His previous placement was with family members and had been disrupted because the foster parents were incarcerated. The current home was safe and appropriate, and Jamari always seemed happy and comfortable. Jamari interacted with his foster parents like a family, and Jamari was very talkative. They seemed to have a bond with each other. Jamari's older sister had been adopted, and Jamari wondered why he had not been adopted yet. He stated several times that he wanted to be adopted. Jamari had sickle-cell trait, but there had not been any flare ups since Sanchez had been assigned the case. Jamari was not on any medications at the time, and his grades and behavior in school had improved since he had been with these foster parents. Sanchez believed that it was in Jamari's best interest that parental rights be terminated.

¶ 30    The foster mother testified that Jamari had been in their home for almost 3½ years, since December 13, 2012. She was aware of Jamari's father and she was willing, when the time was appropriate, to allow contact between Jamari and his father. They planned to address this through Jamari's therapist. When the foster mother would ask Jamari about how he would feel if they found his father, Jamari said he did not want to talk about it.

¶ 31    The foster father testified about all the activities he did with Jamari. He stated that he and his wife came from big families so they understood how important family is. Jamari would need the relationship with his biological family, and they were preparing him for it. They would love to have the opportunity to allow contact between Jamari and his father. Jamari's therapist had known Jamari for about two years, and a lot of things were left up to her. They talked to the therapist about when Jamari should learn of his father. The foster parents wanted to keep the doors open between Jamari and his mother and father. The foster father testified that Jamari was happy and growing up.

¶ 32    The father testified on his own behalf. He felt that he should be out of prison and testified that he had appealed his conviction because he did not meet the requirements for armed habitual criminal. He stated he was enrolled in a parenting program at Danville Correctional Center and was also in anger management. He had four other children, ranging in age from 6 to 21. He felt like he deserved to be in Jamari's life.

¶ 33    The father stated that although he wanted to be in Jamari's life, he honestly did not think it would be fair to take him from his foster home. He "rested good at night knowing [Jamari is] in good hands." The father was hoping he could be in Jamari's life, if they could stay in touch, but his hands were tied at the moment.

¶ 34    The father stated that he had no idea that he was Jamari's father until he was brought into court for this case. His relationship with the mother consisted of texting, talking on the phone a bit, and hooking up. They were not together, they just messed around.

¶ 35    Following arguments at the conclusion of the best interest hearing, the trial court found that it was in Jamari's best interest to terminate parental rights and appoint the DCFS Guardianship Administrator as Jamari's guardian with the right to consent to adoption. The court then changed Jamari's permanency goal to adoption. On February 29, 2016, the trial court judge issued a written order reflecting his oral rulings that the father was unfit based on his failure to maintain reasonable interest, concern, and responsibility, and his failure to make reasonable efforts and progress in any and all nine-month periods. The order entered a permanency goal of adoption for Jamari because his parents' parental rights had been involuntarily terminated and Jamari was in a loving preadoptive home.

¶ 36    On March 14, 2016, the father filed his notice of appeal challenging only the order entered on February 29, 2016, terminating his parental rights to Jamari. In the initial briefing to this court, the father argued service upon him was defective and the lack of effective service rendered the November 2007 and September 2008 adjudicatory and dispositional orders void; therefore, he was denied due process in the termination proceeding based on the earlier void orders, and the termination order should be reversed. The father argued that service by publication was defective because (1) DCFS and the State failed to exercise due diligence in effectuating service, (2) the publication failed to correctly identify the minor as "Jamari [Spelling 2]," and (3) the father did not waive the issue of defective service because his appearance in the matter only resulted in prospective waiver of issues relating to proper service. The father did not argue any other defects or errors in the termination order. The State and the GAL argued that all of the requirements for effective service by publication were met and even if they were not, the father waived any argument relating to service when he appeared in the matter without raising any objections to service.

¶ 37    This court filed an opinion in this case on September 30, 2016. The GAL timely filed a petition for rehearing (PFR). The primary contentions raised in the PFR were that (1) because the father's notice of appeal failed to identify the 2007 and 2008 adjudication and dispositional orders, this court lacked jurisdiction to enter a judgment finding them void for lack of personal jurisdiction and (2) if this court determines it does have jurisdiction to consider the arguments raised in the father's appeal, his challenge to the validity of the 2007 and 2008 orders for the first time on appeal is barred by the doctrine of *laches*. We granted the PFR and withdrew our prior opinion.

¶ 38                                              ANALYSIS

¶ 39    We turn first to the question of this court's jurisdiction. "[T]he only jurisdictional step in appealing a final judgment is the filing of a notice of appeal." *Carroll v. Akpore*, 2014 IL App (3d) 130731, ¶ 2. "Every final judgment in a civil case is appealable pursuant to Supreme Court Rule 301 [citation], and jurisdiction is vested in the appellate court to hear the appeal of that final judgment upon the filing of a notice of appeal." *F.H. Prince & Co. v. Towers*

*Financial Corp.*, 266 Ill. App. 3d 977, 981-82 (1994).[2] "Supreme Court Rule 303(b)(2) provides that a notice of appeal 'shall specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court.' [Citation.] Illinois courts have held that a notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts thereof specified in the notice of appeal." *People v. Smith*, 228 Ill. 2d 95, 104 (2008). While a notice of appeal is jurisdictional, it is generally accepted that such a notice is to be construed liberally. *Id.*

> "When an appeal is taken from a specified judgment only *** the court of review acquires no jurisdiction to review other judgments or parts thereof not so specified or not fairly to be inferred from the notice as intended to be presented for review on the appeal. If from the notice of appeal itself and the subsequent proceedings it appears that the appeal was intended, and the appellant and the appellee so understood, to have been taken from an unspecified judgment or part thereof, the notice of appeal may be construed as bringing up for review the unspecified part of the order or judgment. Such a construction would be appropriate where the specified order directly relates back to the judgment or order sought to be reviewed. Paraphrasing the language of *Elfman*, the unspecified judgment is reviewable if it is a 'step in the procedural progression leading' to the judgment specified in the notice of appeal. [Citation.]" *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 434-35 (1979).

¶ 40　　The notice of appeal filed in this case specified the termination judgment but did not specify either the adjudication or dispositional orders. In this case, the father filed a timely notice of appeal from the judgment of the circuit court terminating his parental rights, which was a final judgment. There is no question this court has jurisdiction to review the judgment terminating the father's parental rights. The father argues the adjudication and dispositional orders are void and, therefore, may be attacked at any time, in any court, including in this appeal. The GAL argues that although a void order may be challenged at any time, an allegation of voidness alone does not give a court jurisdiction to hear the argument. Rather, the GAL argues, "[a] court must have jurisdiction in order to consider a claim of voidness." The GAL argues appellate jurisdiction over the adjudication and dispositional orders does not exist merely because those orders predate the termination order. In support of that argument, the GAL cites *EMC Mortgage Corp. v. Kemp*, 2012 IL 113419, where our supreme court held as follows:

> "[A] void order can be attacked at any time by a person affected by it. [Citation.] This legal proposition, however, by itself, does not act to confer appellate jurisdiction on a reviewing court if such jurisdiction is otherwise absent. [Citation.] Rather, the rule allows a party the ability to always raise the issue of whether an order is void in an appeal where appellate jurisdiction exists and the case is properly before the court of review. [Citation.]" *EMC Mortgage Corp.*, 2012 IL 113419, ¶ 15 (citing *People v. Flowers*, 208 Ill. 2d 291, 308 (2003)).

¶ 41　　Normally, the jurisdiction of the appellate court is limited to the judgments specified in the notice of appeal and those prior orders that are "a 'step in the procedural progression leading' to the judgment specified in the notice of appeal. [Citation.]" *Burtell*, 76 Ill. 2d at 434-35.

---

[2]"[A]ppeals from final judgments under the Juvenile Court Act are governed by the rules applicable to civil cases." *In re Janira T.*, 368 Ill. App. 3d 883, 891 (2006).

However, an exception exists where a party collaterally attacks an allegedly void order on appeal. In *People v. Thompson*, 209 Ill. 2d 19, 25 (2004), our supreme court held that because the defendant's sentence in that case was void, "the appellate court had the authority to correct it at any time and, consequently, did not err in vacating the [void] sentences." *Thompson*, 209 Ill. 2d at 25. The *Thompson* court applied the rule that a sentence which does not conform to a statutory requirement is void. *Id.* at 24. The court has recently abolished the void-sentence rule. *People v. Castleberry*, 2015 IL 116916, ¶ 19. Nonetheless, the *Thompson* court's discussion of the ability to attack a void order "at any time or in any court, either directly or collaterally" (*Thompson*, 209 Ill. 2d at 25) did not depend on *why* the judgment was void. Stated differently, the court did not apply a different rule for orders that were void because they exceeded a trial court's statutory authority than it would apply for orders that were void because the trial court lacked personal or subject matter jurisdiction to enter them. See *id.* (citing *Sarkissian v. Chicago Board of Education*, 201 Ill. 2d 95, 105 (2002) (default judgment alleged to be void for lack of personal jurisdiction due to defective service of process); *Barnard v. Michael*, 392 Ill. 130, 135-36 (1945) (stating rule that a judgment entered by a court which lacks jurisdiction *or* the inherent power to make the order is void and may be attacked at any time or in any court, but holding attack on judgment did not involve jurisdictional matters and that the time for attacking the judgment had passed); *JoJan Corp. v. Brent*, 307 Ill. App. 3d 496, 504-05 (1999) (collateral attack on judicial sale was void based on lack of subject matter jurisdiction); *Potenz Corp. v. Petrozzini*, 170 Ill. App. 3d 617, 617-18 (1988) (claim was that judgment in Japanese yen was void because court lacked inherent power to enter a money judgment in a foreign currency)). The *Thompson* court also held that an "argument that an order or judgment is void is not subject to waiver," and that "courts have an independent duty to vacate void orders and may *sua sponte* declare an order void." *Id.* at 27. The *Thompson* court added that it had not held that "section 2-1401 is the only way in which a void order can be challenged." *Id.* at 29.

¶ 42    Further, in *EMC Mortgage Corp.*, the appellant attempted to appeal a nonfinal order; therefore, the appellate court did not have jurisdiction, and the case was not properly before the court. In this case, timely appeal was filed from a final order terminating the father's rights; therefore, the appellate court has jurisdiction, and the case is properly before the court. Because the appellate court has jurisdiction over the father's appeal from the order terminating his parental rights, this case is distinguishable from *EMC Mortgage Corp.* The *EMC Mortgage Corp.* court relied on our supreme court's earlier decision in *Flowers* for its discussion of the necessity of "an appeal where appellate jurisdiction exists." This appeal is in a different procedural posture than the appeal in *Flowers*, therefore that holding does not control the outcome in this case.

¶ 43    In *Flowers*, the defendant pled guilty, but the trial court rejected the sentence called for by the parties' agreement. *Flowers*, 208 Ill. 2d at 295. The sentence the court imposed included an order to pay restitution. Illinois Supreme Court Rule 604(d) required that before an appeal from a judgment on a plea may be taken, the defendant must either file a motion to reconsider the sentence if only the sentence were being challenged or withdraw the plea and vacate the judgment if the plea is being challenged. *Id.* at 296 (citing Ill. S. Ct. R. 604(d) (eff. Aug. 1, 1992)). The defendant did not file a motion to reconsider the sentence or to withdraw the guilty plea and vacate the sentence. Instead the defendant proceeded directly to filing notices of appeal. *Id.* The appellate court dismissed the appeal on the defendant's motion, and in the interim, the defendant filed a *pro se* petition for postconviction relief in the trial court. *Id.*

Eventually, the attorney appointed to represent the defendant on her postconviction petition filed a motion pursuant to Rule 604(d) seeking reconsideration of the sentences imposed by the trial court in the plea proceeding. *Id.* at 297. The trial court denied the motion to reconsider the sentence, and the defendant's court-appointed attorney filed a second set of notices of appeal and withdrew her postconviction petition. *Id.* A few days later, the defendant filed a third set of notices of appeal in which she stated she was appealing the denial of her " 'Motion to Reconsider—Post Conviction Petition.' " *Id.* The State moved to dismiss the appeal on the grounds the motion that defendant filed attacking the sentence was untimely and that the defendant should have filed a motion to withdraw her guilty plea and vacate the sentence under Rule 604(d). *Id.* at 298. The appellate court rejected both arguments. *Id.*

¶ 44    Our supreme court began by noting that the failure to timely file a 604(d) motion "does not deprive the appellate court of jurisdiction over a subsequent appeal." *Id.* at 301. Rather, as a general rule "the failure to file a timely Rule 604(d) motion precludes the appellate court from considering the appeal on the merits." *Id.* In *Flowers*, the court found that because the defendant had been admonished as to the requirements of Rule 604(d) and failed to timely file a motion to reconsider her sentence, she "should not have been permitted to continue with the appeals she filed *** after sentence was imposed." *Id.* at 302. By the time the defendant in *Flowers* filed a motion to reconsider, the trial court had lost jurisdiction. *Id.* at 303. Our supreme court held that because the trial court's jurisdiction had lapsed by the time the defendant filed her motion under Rule 604(d), the appellate court had no authority to address the Rule 604(d) motion on the merits. *Id.* at 306.

¶ 45    The court further found that even if the appellate court found the defendant's arguments meritorious, it could not have granted her relief. *Id.* The trial court's order on the Rule 604(d) motion, which it made at a time it lacked subject-matter jurisdiction to consider the motion, was void, and "[a] void order does not cloak the appellate court with jurisdiction to consider the merits of an appeal." *Id.* at 306-07. Instead, "[t]he only matter properly before the appellate court was the circuit court's lack of jurisdiction over Flowers' untimely Rule 604(d) motion." *Id.* at 307. In *Flowers*, "[b]ecause the appellate court went beyond the question of the [trial court's] lack of jurisdiction" over the Rule 604(d) motion, its judgment on appeal—that the motion was not deficient for failing to include a request to withdraw her guilty plea and that the trial court erred when it included restitution in the sentence—could not be sustained. *Id.* The trial court "had no jurisdiction to entertain that motion," so the appellate court "should simply have vacated the [trial court's] judgment and dismissed [the] appeal." *Id.*

¶ 46    Our supreme court found that the attack on the withholding portion of the trial court's sentencing judgment presented a "more difficult problem." *Id.* The defendant argued that portion of her sentence was void, and the appellate court had addressed that argument by relying on the "well-established principle of law [which holds] that a void order may be attacked at any time or in any court, either directly or collaterally." *Id.* at 308 (citing *Sarkissian*, 201 Ill. 2d at 103). Our supreme court found that the appellate court erred when it relied on this principle, holding:

> "Although a void order may be attacked at any time, the issue of voidness must be raised in the context of a proceeding that is properly pending in the courts. If a court lacks jurisdiction, it cannot confer any relief, even from prior judgments that are void. The reason is obvious. Absent jurisdiction, an order directed at the void judgment would itself be void and of no effect.

- 10 -

Consistent with these principles, the appellate court is not vested with authority to consider the merits of a case merely because the dispute involves an order or judgment that is, or is alleged to be, void." *Id.*

Our supreme court held that the appellate court's "power attaches only upon compliance with the rules governing appeals." *Id.* Because Rule 604(d) is such a rule, because strict compliance with that rule "is a condition precedent to an appeal on the merits," and because the "requirements of the rule were plainly not met," our supreme court held that the appellate court "had no authority to intervene and vacate that portion of Flowers' sentence." *Id.* at 308-09.

¶ 47    The *Flowers* court found that because the trial court's jurisdiction over the underlying criminal case had lapsed, the trial court had no authority to address the Rule 604(d) motion on the merits and, consequently, the appellate court "had no authority to consider the merits of her appeal from the circuit court's judgment denying [that] motion." *Flowers*, 208 Ill. 2d at 307. "That the circuit court's order was void [was] fatal to the appellate court's judgment." *Id.* That finding carried over to the appellate court's judgment on the allegedly void portion of the defendant's sentence because "the issue of voidness must be raised in the context of a proceeding that is properly pending in the courts." *Id.* at 308. "[T]he appellate court is not vested with authority to consider the merits of a case *merely* because the dispute involves an order or judgment that is, or is alleged to be, void." (Emphasis added.) *Id.* In *Flowers*, appellate jurisdiction never attached due to noncompliance with Rule 604(d). See *id.* at 308-09 (holding that because requirements of Rule 604(d) were "plainly not met," the appellate court had no authority to intervene and vacate the void portion of the defendant's sentence).

¶ 48    In this case, however, the father filed a timely notice of appeal from a valid, final, and appealable judgment terminating his parental rights. We also note he filed a timely notice of appeal in the same proceedings that gave rise to the allegedly void orders. See *In re Abner P.*, 347 Ill. App. 3d 903, 908 (2004) (holding that the filing of a petition to terminate parental rights does not initiate an entirely new proceeding within an existing case number). Thus, nothing in *Flowers* prohibits this court from considering whether the adjudication and dispositional orders are void. This court's authority properly attached to the proceedings that gave rise to the allegedly void orders, and despite the father's failure to appeal those orders, a void order may be attacked at any time, directly or collaterally in a court with jurisdiction of the parties and the subject matter. *Flowers*, 208 Ill. 2d at 308. Notably, the *Thompson* court also addressed its earlier holding in *Flowers* and held that *Flowers* did not compel a different conclusion in *Thompson*. *Thompson*, 209 Ill. 2d at 27. The *Thompson* court found that in contrast to *Flowers*, the defendant's postconviction petition was properly before the trial court and the defendant's appeal to the appellate court from the dismissal of that postconviction petition was properly before the appellate court; thus, there was "no jurisdictional impediment" to the granting of relief from the void portion of the trial court's sentencing order (*id.* at 28-29), despite the fact the petition filed in the trial court did not challenge the defendant's sentences (*id.* at 21-22). See also *Castleberry*, 2015 IL 116916, ¶ 11 (" 'Where jurisdiction is lacking, any resulting judgment rendered is void and may be attacked either directly or indirectly at any time.' [Citation.]").

¶ 49    Having determined this court does have jurisdiction over the adjudicatory and dispositional orders to the extent they may be void, we note that the parties argued extensively over whether those orders are in fact void because the trial court lacked personal jurisdiction over the father based on the allegedly defective service by publication. "A judgment is void (as opposed to

voidable) only if the court that entered it lacked jurisdiction." *People v. Raczkowski*, 359 Ill. App. 3d 494, 496-97 (2005). We review *de novo* the legal question of whether a trial court obtained personal jurisdiction. *In re Detention of Hardin*, 238 Ill. 2d 33, 39 (2010).

¶ 50　　　We must first address the issue of whether *laches* applies to the father's challenge in this case because if the claim is barred by *laches* there may be no need for us to determine whether the adjudication and dispositional orders are void for lack of personal jurisdiction. *In re Adoption of Miller*, 106 Ill. App. 3d 1025, 1030 (1982). The *In re Adoption of Miller* court held that because it found that the father's petition was barred by *laches*, "it is unnecessary to determine whether the adoption judgment was void or merely voidable." *Id.* In *Pyle v. Ferrell*, 12 Ill. 2d 547 (1958) (cited in *In re Adoption of Miller*), the plaintiff sought equitable relief from a tax sale "on the theory that the tax deed *** was void for various incidents of nonconformance with the statutory requirements for the issuance of a valid tax deed." *Pyle*, 12 Ill. 2d at 551-52. The defendant denied the invalidity of the deed and also "affirmatively defended on the ground of *laches*" and other grounds. *Id.* at 552. The lower court did not pass on the issue of whether the tax deed was void but dismissed the complaint on the ground the plaintiff had been guilty of *laches*. *Id.* Our supreme court agreed and held that the circuit court properly found the plaintiff guilty of *laches* without addressing whether the tax deed was void. See *id.* at 555-56. In *Slatin's Properties, Inc. v. Hassler*, 53 Ill. 2d 325 (1972) (also cited in *In re Adoption of Miller*), the plaintiff sought to quiet title to several vacant lots. *Hassler*, 53 Ill. 2d at 326. The defendants argued the plaintiff was barred from maintaining the action by section 7 of the Limitations Act, which provided as follows: " 'Whenever a person having color of title, made in good faith, to vacant and unoccupied land, shall pay all taxes legally assessed thereon for seven successive years, he or she shall be deemed and adjudged to be the legal owner of said vacant and unoccupied land, to the extent and according to the purport of his or her paper title. ***' Ill. Rev. Stat. 1965, ch. 83, par. 7." *Hassler*, 53 Ill. 2d at 328. The courts construed section 7 "as requiring that the person having color of title made in good faith and thereafter paying the legally assessed taxes for seven successive years must also take possession of the property." *Id.* The *Hassler* court found that the defendants had not exercised sufficient acts of possession of the property. *Id.* at 328-29. Nonetheless, the defendants also argued that the plaintiff was precluded from instituting suit because plaintiff was barred by *laches*. *Id.* at 329. Our supreme court agreed and held that the plaintiff was barred by *laches* from asserting any claims to the premises in question. *Id.* at 331.

¶ 51　　　The GAL argues that the legal doctrine of *laches* applies to prevent the father from objecting to personal jurisdiction in this case. The father argues that the GAL forfeited its *laches* argument in the PFR by failing to raise it during the initial appeal.

¶ 52　　　In response to the father's forfeiture argument, the GAL replies only that forfeiture is a limitation on the parties, not the court, and we may choose to exercise our discretion to entertain this argument. This court has held that the rule that points not argued are waived and shall not be raised on petition for rehearing is a limitation on the parties and not the court. *A.J. Maggio Co. v. Willis*, 316 Ill. App. 3d 1043, 1048 (2000). "Even though an issue is waived, we may address it based on our obligation to achieve a just result and maintain a uniform body of precedent." *Country Mutual Insurance Co. v. Hagan*, 298 Ill. App. 3d 495, 507 (1998); see also *Mellon v. Coffelt*, 313 Ill. App. 3d 619, 626 (2000) ("In this case, we believe that it is in the interest of justice to consider the enumerated challenges to the statute, and we note that we are able to do so without the aid of cogent appellate argument. Therefore, we choose to address

this issue, waiver notwithstanding."). This court will relax forfeiture rules when important issues that are indispensable to a just resolution of the appeal before the court are involved. For the following reasons, we find that the GAL's *laches* argument raises an important issue that merits relaxation of the forfeiture rule.

¶ 53     "The *laches* doctrine may be invoked to preclude the assertion of parental rights. (*In Re Miller* (1980), 84 Ill. App. 3d 199, 202, 405 N.E.2d 25; *Rodriguez v. Koschny* (1978), 57 Ill. App. 3d 355, 360-362, 372 N.E.2d 47.)" *In re Adoption of Miller*, 106 Ill. App. 3d at 1030. The *In re Adoption of Miller* court stated the rationale for applying the doctrine of *laches* to adoption judgments as follows:

> "The adoption decree is *sui generis* because it closely concerns the life of someone other than the contending parties, the child. A rule that an individual's right to set aside a judgment entered without jurisdiction over him cannot be cut off by lapse of time (assuming there is such a rule) does not and should not apply to the case where interests exist superior to those of the party whose rights are terminated. [Citations.]" (Internal quotation marks omitted.) *Id.* at 1030-31.

¶ 54     Consideration of whether *laches* applies is indispensable to a just resolution of this appeal because of the superior interests involved. Further, the *In re Adoption of Miller* court stated that "[t]he issue of *laches* does not have to be decided after a trial on the merits but may properly be determined on a motion to dismiss if its applicability appears from the face of the complaint or by affidavits submitted with the motion." *Id.* at 1032. The fact we may determine the issue of *laches* from the face of the pleadings before us also weighs in favor of relaxing the forfeiture rule to consider the GAL's *laches* argument. See *Coffelt*, 313 Ill. App. 3d at 626 (addressing issue, forfeiture notwithstanding, in part because the court was able to do so without the aid of appellate argument). Therefore, we find that the GAL has not forfeited the argument that, in this case, the legal doctrine of *laches* applies to prevent the father from objecting to personal jurisdiction.

¶ 55     "Illinois cases recognize that even if service of process is defective an attack on a decree may be barred by laches. [Citation.] It is a basic to the laches doctrine that a complainant may be barred when, after ascertaining the facts, he fails promptly to seek redress." *Rodriguez*, 57 Ill. App. 3d at 361-62. The *Koschny* court had found no Illinois authority which, to date, had applied the doctrine of *laches* to preclude the assertion of parental rights. *Id.* at 360-61. But the court found that "the circumstances of this case illustrate the reasonable need to apply that equitable principle to prevent a serious disruption of a stable family unit." *Id.* at 361. That case involved a mother who refrained from seeking legal enforcement of her parental rights over a nine-year period. *Id.* at 362. By the time the mother did enforce her rights, the court found that the case "now involves not an infant but a 12-year-old child and his adoptive parents who have lived with him in a family relationship for a dozen years." *Id.* at 361.

¶ 56     In *In re Adoption of Miller*, the natural father of a minor child sought to vacate a judgment of adoption alleging that service by publication in adoption proceedings was defective. *In re Adoption of Miller*, 106 Ill. App. 3d at 1029. Almost one year after the judgment for adoption was entered, the father appeared in court on an emergency motion for visitation. *Id.* at 1027. The father, who was represented by counsel, was presented with a copy of the judgment for adoption at that time. *Id.* "[A]pproximately 21 months after Miller and his counsel learned of the adoption judgment, Miller filed a petition for leave to examine the file in the adoption case, alleging that as [the] father he was not served with summons at his then residence ***." *Id.* The

adoptive parents argued, in part, that the petition to vacate the adoption judgment "should be dismissed on grounds of *laches* in that Miller and his attorney were informed of the adoption judgment in open court \*\*\*, yet did not file a petition to vacate that judgment until almost 21 months later." *Id.* at 1027-28. The trial court found that service was defective, but the father had not shown due diligence in filing a petition for relief from judgment. *Id.* at 1029.

¶ 57 On appeal, the father argued the judgment for adoption was void *ab initio* and since a void judgment may be attacked at any time, he did not have to demonstrate due diligence under the statute governing petitions for relief from judgment. *Id.* The adoptive parents countered that the adoption judgment was merely voidable and, thus, the father had to show due diligence in challenging it. *Id.* This court found that the time limitations in the statute on petitions for relief from judgment do not apply to a party raising the issue of lack of jurisdiction. *Id.* at 1030. "Nevertheless, while the strictures of section 72 [(now section 2-1401)] do not apply, the equitable defense of *laches* may be interposed to an attack on a void judgment." *Id.*

¶ 58 To establish the defense of *laches*, a party must show that there was unreasonable delay in bringing the action and that the delay materially prejudiced him. *Id.* at 1033. The father argues that *laches* does not apply in this case because the adoption has not been finalized. The father relies on this court's decision in *In re M.B.*, 235 Ill. App. 3d 352 (1992), which he contends held that *laches* cannot apply in cases where the adoption was not finalized. The GAL, in reply to the father's argument, asserts that the decision in *In re M.B.* actually lends support to its argument. We disagree with the father's interpretation of the decision in *In re M.B.* That case involved an appeal of a trial court order granting a petition pursuant to section 2-1401 to vacate a finding of neglect and adjudication of wardship and an order appointing a legal guardian. *Id.* at 354. The court held that the trial court had not abused its discretion in granting the 2-1401 petition or in finding that misrepresentations by the legal guardian tolled the time for the parents to file the petition more than two years after the guardianship order. *Id.* at 379. The appellants in that case argued that the 2-1401 petition was barred by the doctrine of *laches*. *Id.* at 380. The court held that "in view of the fraudulent concealment \*\*\*, the *laches* doctrine is not applicable here." *Id.* The court noted that:

> "Furthermore, in cases where *laches* operated to preclude the assertion of parental rights, adoptions had occurred and the doctrine of *laches* was applied to preserve the stability of the family unit. [Citations.] By way of contrast, [the legal guardian] did not adopt M.B.; rather, she provided him with what essentially was a foster home. Furthermore, the parents' delay in this case will not disrupt or materially prejudice any stable family relationship, because M.B. no longer lives with [the legal guardian]. He currently resides at the Boys' Hope facility in Evanston, where he is doing well. We decline to apply the doctrine of *laches* here." *Id.* at 380-81.

¶ 59 The foregoing statement in *In re M.B.* is hardly a ruling that *laches* does not apply to cases pending under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2012)) or that *laches* cannot apply in cases where the adoption was not finalized, as the father claims. Notably, the *In re M.B.* court stated that "the parents' delay in this case will not disrupt or materially prejudice *any* stable family relationship, because M.B. no longer lives with [the guardian]." (Emphasis added.) *In re M.B.*, 235 Ill. App. 3d at 381. It is evident the court would have considered the minor child's family relationship with the legal guardian had the minor still resided with her, regardless of whether the adoption had been completed. There is no language in *In re M.B.* restricting the application of the doctrine of *laches* in the way the father

- 14 -

suggests. We reject the father's argument *laches* does not apply based on the procedural posture of this case.

¶ 60    The GAL argues the father failed to raise the issue of personal jurisdiction for almost two years after he was identified as the father and was appointed counsel, that delay was unreasonable, and "the stability of 9-year-old Jamari's life *** will unquestionably be disrupted by [the father's] long-delayed challenge to personal jurisdiction"; therefore, *laches* applies. We agree.

> "*Laches* has been defined as 'such neglect or omission to assert a right, taken in conjunction with a lapse of time of more or less duration and other circumstances causing prejudice to an adverse party, as will operate to bar relief in equity.' [Citation.] The existence of *laches* 'depends on whether, under all circumstances of a particular case, a plaintiff is chargeable with want of due diligence in failing to institute proceedings before he did.' [Citation.]" *In re Adoption of Miller*, 106 Ill. App. 3d at 1030.

In this case, the trial court appointed counsel to represent the father on June 19, 2014. The first hearing on the TPR petition was held on October 8, 2015, and the father was present at that hearing. At that hearing, the State requested that the court take judicial notice of the adjudication order for Jamari entered on November 2, 2007, and the dispositional order entered on September 18, 2008. The trial court continued the matter to December 14, 2015, for status on the disposition of the father's appeal of a criminal conviction. The court terminated the father's parental rights on February 29, 2016. The court found that Jamari was in a loving preadoptive home, where he had been since December 2012. As the GAL points out, the father was a party to the proceedings for over 1½ years before the trial court terminated his parental rights. If we were to construe the notice of appeal as the father's first assertion of the trial court's lack of jurisdiction, the lapse of time approaches two years during which the father could have attacked the trial court's lack of personal jurisdiction but did not. Throughout the period the father was a party to these proceedings and failed to challenge the court's jurisdiction, and longer, Jamari has been in a stable family environment with foster parents who wish to adopt him.

¶ 61    Based on the foregoing we find that the father is chargeable with want of due diligence in asserting the trial court's lack of personal jurisdiction over him for the adjudication and dispositional orders. In *In re Miller*, 84 Ill. App. 3d 199 (1980), the natural father filed a petition to vacate an order appointing the minor's grandfather as her guardian. *Id.* at 200. The father filed his petition almost three years after the trial court entered the guardianship order. *Id.* The mother testified that she had informed the father that her parents had been appointed guardians a few months after the guardianship proceeding was completed. *Id.* at 202. The father had not been served with a summons, but notice by publication was given in a local newspaper. *Id.* at 200. The trial court found that the notice by publication was defective but the father had not timely filed his petition to vacate. *Id.* at 202. On appeal, the court found that "if [a] parent has actual knowledge of the facts and fails to promptly seek redress, the doctrine of *laches* will bar an attack upon the decree." *Id.* The appellate court affirmed the trial court's judgment denying the father's petition "in view of the failure of [the father] to assert his rights, of which the court found he had knowledge, and in view of the lapse of time." *Id.* at 203.

¶ 62    Here, there is no disputed question of fact that the father knew of the adjudication and dispositional orders. *Cf. id.* The father, represented by counsel, participated in the termination

- 15 -

proceedings with knowledge that the adjudication and dispositional orders were prerequisites to termination proceedings. The father had actual knowledge of the adjudication and dispositional orders yet failed to take any steps to challenge them for almost two years. In *In re Adoption of Miller*, the court found the father's explanation for his delay in attacking the judgment for adoption—that the father was a " 'traveling man,' " did not have the money to start right away, and " 'it was inconvenient and one thing or another' "—insufficient to warrant the relief requested. *In re Adoption of Miller*, 106 Ill. App. 3d at 1031 (citing *In re Adoption of Rayborn*, 32 Ill. App. 3d 913, 915 (1975)). The father in this case has offered *no* explanation for his delay. Based on the father's knowledge of the orders and the absence of any legal disability or duress (see *id.*), we find the father's delay in attacking the adjudication and dispositional orders was unreasonable.

¶ 63        The application of *laches* requires both delay and prejudice. See generally *People ex rel. Alvarez v. Gaughan*, 2016 IL 120110, ¶ 14. "In the case of an adoption the potential of prejudice is greater because the delay affects not only the immediate parties but also the child." *In re Adoption of Miller*, 106 Ill. App. 3d at 1033. In *In re Adoption of Miller*, the court found that:

> "[I]t would be extremely prejudicial to the stability of the family life Tashyna has enjoyed to permit the natural father to wait almost two years after he learned of the adoption to attack it. As one court has observed, '[p]robably in no other area of the law is the desirability of finality of determination greater than that which obtains in the field of adoption of children.' [Citation.] To allow Miller to challenge the judgment of adoption 21 months after he discovered it and more than 5½ years after he last saw Tashyna would unquestionably disrupt the tranquility of a family unit which now involves not an infant but an eight-year-old child and her adoptive parents with whom she has lived during her critically significant formative years. We decline to do so." *Id.* at 1033.

In *Koschny*, the court found that the prejudice was "quite obvious" where the adoptive parents had "assumed the parental responsibilities of caring, feeding, clothing and sheltering the child" for a substantial period of time. *Koschny*, 57 Ill. App. 3d at 362. Although the period in *Koschny* was admittedly longer than the time Jamari has been with his preadoptive family, Jamari has been in a stable family relationship for more than two years, which continues to be disrupted by these proceedings. *Cf. In re M.B.*, 235 Ill. App. 3d at 380-81. "Disruption of the continuity of relationship between the child and his 'psychological parents' is almost certain to adversely affect the child's development." *Koschny*, 57 Ill. App. 3d at 362.

¶ 64        In this case, the tranquility of Jamari's life and family unit has been disrupted by the lack of finality. Jamari's caseworker testified that Jamari seems happy and comfortable in his home but wondered why he had not been adopted yet. Moreover, the father admits that although he wants to be a part of his son's life, he is not capable of caring for Jamari and does not want to disrupt Jamari's life with his foster parents. We decline to continue to subject Jamari and his family to this state of limbo where the father has not asserted a justification for his delay in challenging the trial court's jurisdiction after he became a party to these proceedings. Further delaying resolution of his permanent placement would be detrimental to Jamari's welfare. We hold that the father is barred by *laches* from challenging the adjudication and dispositional orders.

¶ 65        Because the father's belated attack on the trial court's jurisdiction to enter the adjudication and dispositional orders is barred by *laches*, we have no need to determine whether the orders are void because service by publication in this case was defective. As the father offered no other argument attacking the propriety of the order terminating his parental rights, the trial court's judgment is affirmed.

¶ 66                                    CONCLUSION
¶ 67        For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 68        Affirmed.