2025 IL App (1st) 240984-U

FIRST DISTRICT,
SIXTH DIVISION
February 21, 2025

Nos. 1-24-0984, 1-24-1035, & 1-24-1146 (cons.)

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* L.P., a minor | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County, Illinois |
| (The People of the State of Illinois, | ) | Juvenile Justice and |
| | ) | Child Protection Department, |
| Petitioner-Appellee, | ) | Child Protection Division. |
| | ) | |
| v. | ) | No. 16 JA 00630 |
| | ) | |
| Raquel V. and Ery P., | ) | Honorable |
| | ) | Shannon P. O'Malley, |
| Respondents-Appellants). | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1      *Held*: Trial court's private guardianship order is (1) affirmed in part where the disposition order entered seven years prior was not void and, therefore, not subject to collateral attack and (2) reversed and remanded for modification of a more reasonable visitation with minor.

¶ 2      Respondents Raquel V. and Ery P. appeal from the trial court's April 25, 2024, private guardianship order appointing minor L.P.'s foster mother of eight years as her private guardian

and ordering a minimum of one unsupervised visit with respondents per month.[1] Rather than challenging the trial court's finding that guardianship is in L.P's best interest, respondents argue that the disposition order entered seven years prior is void because it lacks certain statutory language outlined in section 2-27 of the Juvenile Court Act (Act) (705 ILCS 405/2-27 (West 2016)). Alternatively, respondents ask that we remand for modification of the private guardianship order to provide for additional visitation with L.P. We affirm in part and reverse and remand for modification of visitation.

¶ 3                                    I. BACKGROUND

¶ 4         L.P. was born to respondents on July 27, 2016. The very next day L.P was placed in protective custody due to Raquel's open DCFS case involving her son D.R. from a prior relationship. On August 1, 2016, the State filed a petition for adjudication of wardship and motion for temporary custody of L.P., alleging neglect due to an injurious environment and abuse due to substantial risk of physical injury. 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2016). The petition alleged Raquel had "one prior indicated report for cuts, bruises, welts, abrasions and oral injuries" for D.R., "who is in DCFS custody with findings of abuse and neglect having been entered." Raquel's reunification services were ongoing, and Ery was "assessed to need parenting services, mental health and substance abuse assessments." The trial court granted the State's petition and granted temporary custody with the right of placement to the DCFS Guardianship Administrator. L.P. was placed in the care of her maternal great aunt Jennifer, where she has remained ever since.

---

[1] We consolidated Ery and Raquel's appeals (case Nos. 1-24-0984 and 1-24-1146) along with Ery's duplicate appeal (case No. 1-24-1035).

¶ 5		On May 1, 2017, L.P. was adjudicated neglected due to an injurious environment under a theory of anticipatory neglect based on Raquel's failure to make progress in services in D.R.'s case and Ery's need for services. On September 27, 2017, the court held a dispositional and permanency hearing for L.P. Respondents were present and represented by counsel. Caseworker Yesenia Alatorre recommended L.P. be made a ward of the court and placed in the guardianship of the DCFS Guardian Administrator while respondents continued reunification services. Immediately following the hearing, the trial court entered a standardized disposition order (placement) adjudging L.P. a ward of the court. The court checked certain boxes on the preprinted form, finding respondents "unable for some reason other than financial circumstances to care for, protect, train, or discipline the minor" and that it was in the "best interest of the minor to remove the minor from the custody of the parents ***. " The court also entered a permanency goal of return home within 12 months.

¶ 6		Respondents continued reunification services and consistently visited L.P. However, two incidents during unsupervised visits at their home resulted in the temporary suspension of visitation. The first was a March 2020 verbal altercation between Raquel and Jennifer, which occurred when Jennifer arrived to check on L.P. after receiving a call reporting screams coming from respondents' home. The second was an October 2020 domestic violence incident between Raquel and her brother. After an almost three-month break from all visitation, supervised visits were reinstated in January 2021 and continued to be supervised through April 2024.

¶ 7		On May 11, 2021, the trial court referred the case to the Cook County Juvenile Court Clinic (CCJCC) to help determine the appropriate permanency goal, as the court was considering

terminating respondents' parental rights. The October 7, 2021 CCJCC report[2] outlines respondents' involvement with DCFS, the 2020 incidents that led to suspended visitation, and respondents' progress towards reunification. The evaluator concluded that there was a low to moderate likelihood that respondents, as a couple, would make gains necessary for L.P. to return home, depending on what additional services were offered to the family.

¶ 8        On October 7, 2022, the trial court changed the permanency goal to private guardianship given that L.P. "has been in this home for six years and sees her foster parent as her mom and wishes to remain in the home. Parents are engaged in services and it is in [L.P.'s] best interest for the foster parent to be her guardian." Even after the change of permanency goal, DCFS continued to monitor and evaluate the respondents. A May 3, 2023 DCFS Permanency Hearing Report acknowledges that clinical staffings on June 16, 2022, and September 27, 2022, found return home was the "fittest goal." However, DCFS was now recommending guardianship because L.P. "stated that she preferred to stay in her current home ***" and "[t]he court considered it to be in [L.P.'s] best interest *** since she has been living there for nearly 7 years, and she views the foster parents as her primary parents."

¶ 9        On December 7, 2023, DCFS filed a "Petition to Appoint a Guardian of the Person of the Minor," requesting Jennifer be appointed L.P.'s guardian. A private guardianship hearing was held on April 25, 2024.[3] At this point, respondents had completed all recommended services

---

[2] The October 7, 2021 CCJCC report is the only exhibit that was admitted at the private guardianship hearing.

[3] On December 11, 2023, Ery filed a "Motion to Change the Permanency Goal to Return Home or in the Alternative to Return the Minor to the Care of [Ery P.] Under an Order of Protection." That motion was still pending at the time of the private guardianship hearing. However, the trial court clarified that the parties were "going to move forward on the 'Petition to Appoint Guardian [of] the Person of The Minor.' " On the same day as the hearing, Raquel filed a motion to change permanency goal to return home.

except for child/parent psychotherapy, which was discontinued after the October 2020 domestic violence incident. Raquel completed a domestic violence program, individual therapy, couples therapy, and medication monitoring. Ery completed individual and couples therapy. Caseworker Marelinne Carrillo-Acosta acknowledged that DCFS found return home to be the "fittest goal" in September 2022. However, after it was "clinically staffed *** again," DCFS recommended a goal change to guardianship based on "what [L.P.] was reporting at that time."

¶ 10        Carrillo-Acosta testified that she was assigned to L.P.'s case two years ago. She explained that L.P. has lived in a safe home with Jennifer, her husband, and their two sons, since she was five days old. L.P. refers to her foster parents as "mom" and "dad," and for at least the last two years, L.P. expressed her desire to live with Jennifer full time and for Jennifer to become her guardian. Carrillo-Acosta recommended Jennifer be appointed L.P.'s guardian and the case be closed, since L.P. has been in the home for nearly eight years, "[i]t is what she reports wanting," and she is "very bonded to both foster parents." L.P. is also bonded with respondents with whom she has enjoyed supervised visits of no less than one visit per month. Carillo-Acosta acknowledged that one hour is not enough time for them to be together. In Carrillo-Acosta's opinion, it would be in L.P.'s best interest to have more than one hour of visitation with respondents per month. However, she acknowledged that the "authority for that time is going to be with the foster parent."

¶ 11        Jennifer testified that she plans on allowing one, one-hour visit per month, supervised by her husband. This includes visits with L.P.'s two younger siblings in respondents' care. She indicated a willingness to expand visits if that is what L.P. wants, but it had not yet occurred. Jennifer testified that she considers L.P. to be one of her own children and affirmed her desire to become L.P.'s legal guardian. Jennifer acknowledged that it is "important for [L.P.] to maintain a

relationship with her biological mom[,] dad," and siblings, and she is open to providing time for phone and Facetime calls and inviting respondents to school events.

¶ 12    Jennifer acknowledged the "tension" between herself and Raquel. For example, in December 2023, Raquel "start[ed] acting aggressively [and] making threats" when Jennifer tried sitting closer to Raquel and L.P. during a visit. After this, Jennifer was uncomfortable supervising visits and she "change[d] her mind" about a previous agreement for two-hour visits twice a month. Her husband is the only one that can supervise, and he is only available for one hour per month. There was another incident where Raquel told L.P. not to call her foster parents "mom" and "dad" because respondents "were the real parents." Following this incident, L.P. "mentioned she doesn't want unsupervised visits."

¶ 13    Ery testified that L.P. never told him that she was uncomfortable being in his presence alone and that L.P.'s younger sister is very bonded to L.P. and wants to see her more. Raquel acknowledged that while she was not a good mother in the past, the services she completed "changed [her] life." Now, she can control her emotions, spends time with her kids, and has a good relationship with her husband. Raquel worries that Jennifer is "not going to allow [her] to see [L.P.]" if the case is closed. L.P. told Raquel that she could not live with Raquel right now because her "mother" is taking care of her and bought her two dogs.

¶ 14    On April 25, 2024, the trial court entered a private guardianship order, finding it in L.P.'s best interest to terminate wardship, appoint Jennifer as L.P.'s guardian, and close the case. The court noted the 2022 goal change and that "after all these years, services have been completed." However, there have been no unsupervised visits with respondents since October 2020; L.P.'s foster parents provide a loving home, where she has lived since she was five days old; L.P. calls

her foster parents "mom" and "dad"; and she "has expressed *** she wants to be with the foster parent."

¶ 15     The court acknowledged that "visits [are] a little limited. Perhaps in the future *** they can expand the visits." The trial court ordered Jennifer to provide "reasonable visitation *** with a minimum of one visit each month" and to "arrange for visits with the child's siblings." The visits are to be unsupervised, "unless [Jennifer] determine[s] supervision is necessary for the safety or protection of the child." Jennifer can cancel any individual visit if they would be "harmful or inappropriate," and if the visits are helpful to L.P., Jennifer should consider "the number or alteration," given her testimony that "she would allow more than one hour visitation" if there was a special event or family function. Respondents appeal.

¶ 16                                   II. ANALYSIS

¶ 17     Respondents ask us to (1) vacate the 2024 private guardianship order because the September 2017 disposition order, which set guardianship in motion, is "void" for failing to include a specific written finding under section 2-27 of the Act and (2) remand for modification of the order to provide respondents with more frequent and longer visitation with L.P. The Cook County Public Guardian (Public Guardian), the Cook County State's Attorney, and DCFS (Appellees) ask us to affirm.

¶ 18                   A. Untimely Appeal of the 2017 Disposition Order

¶ 19     Appellees argue we lack jurisdiction to consider respondents' challenge to the disposition order entered on September 27, 2017, as respondents failed to appeal the order within 30 days of its entry. They also argue the doctrines of forfeiture and *laches* bar review.

¶ 20     It is obvious respondents missed the 30-day window in which to appeal the 2017 disposition order. They don't even mention the order in their 2024 notices of appeal.

Nonetheless, they argue the 2017 order is void so it may be challenged at anytime. Specifically, respondents argue the 2017 order is void because the court failed to comply with section 2-27 of the Act and, therefore, the court was "without authority to proceed to guardianship" for L.P. in 2024.

¶ 21 Section 2-27 provides that after a minor has been adjudicated a ward of the court, the court may "at this hearing and at any later point" place a minor with a relative or nonrelative as legal custodian or guardian, with a probation officer or other agency, or with a private guardian. 705 ILCS 405/2-27(1) (West 2016). The court may do this if it "determines and puts in writing the factual basis supporting the determination of whether the parents *** of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor ***, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of the minor's parents ***." *Id.* Respondents maintain that the absence of a written finding that L.P.'s "health, safety, and best interest *** will be jeopardized" if she remains in respondents' custody, renders the disposition order void and, thus, requires vacatur of the 2024 private guardianship order.

¶ 22 Not so. The 2017 disposition order is void only if the circuit court lacked jurisdiction over the parties or the subject matter. *LVNV Funding, LLC v. Trice*, 2015 IL 116129, ¶ 48 (citing *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 530-31 (2001)). Respondents do not allege the absence of either subject matter or personal jurisdiction. Rather, relying on *In re D.W.*, 214 Ill. 2d 289, 309 (2005), they maintain that dispositional orders that "are not authorized by statute" and "overstep the statutory limits" are "void and must be vacated." However, the 2017 order is not an order unauthorized by statute or beyond the statutory limits of the court's authority. At most, the order is erroneous for the court's failure to include a certain written factual finding, but

this does not make it void or subject to collateral attack. *In re M.W.*, 232 Ill. 2d 408, 414-15 (2009) (citing *People v. Davis*, 156 Ill. 2d 149, 156 (1993)) (an order entered without subject matter or personal jurisdiction is void and may be attacked at any time, but an order entered in error by a court with jurisdiction is merely voidable and not subject to collateral attack).

¶ 23        Indeed, the Supreme Court has made clear that "the failure to comply with a statutory requirement or prerequisite does not negate the circuit court's subject matter jurisdiction or constitute a nonwaivable condition precedent to the circuit court's jurisdiction." See *LVNV Funding, LLC*, 2015 IL 116129, ¶ 32; see also *In re G.F.H.*, 315 Ill. App. 3d 711, 716 (2000) ("That a court acts beyond its statutory *authority* in a particular case does not mean that the court lacks *jurisdiction* over the type of proceeding involved" (emphasis in original)). Therefore, the court's alleged failure to include a specific written finding in the disposition order under section 2-27 is not a jurisdictional defect that gives respondents a limitless timeframe by which to appeal the 2017 order.

¶ 24        What's more, respondents have forfeited their challenge to the 2017 order by not raising their arguments in the circuit court. See *Mabry v. Boler*, 2012 IL App (1st) 111464, ¶ 24 (arguments not raised in the circuit court are forfeited on appeal). Their claim is also barred by *laches* due to their unreasonable delay seeking relief, which prejudiced L.P.

¶ 25        *In re Jamari R.*, 2017 IL App (1st) 160850, is on point. In *Jamari R.*, the biological father appealed from a March 2016 order terminating his parental rights. Like respondents, he challenged the November 2007 adjudicatory and September 2008 disposition orders for the first time on appeal. The court held his challenge to these orders was barred by *laches* due to his lack of diligence in challenging the orders despite participating in the termination proceedings and having the benefit of counsel. *Id.* ¶¶ 62, 65. The court also found prejudice to the minor, as he

"has been in a stable family relationship for more than two years, which continues to be disrupted by these proceedings." *Id.* ¶¶ 63-64.

¶ 26   Respondents' lack of due diligence is even more apparent here: they were involved and represented by counsel from the beginning, yet waited seven years to challenge the disposition order in any respect. Although a more favorable goal of return home was initially entered, the basis upon which respondents now challenge the disposition order existed on its face when it was entered. We also find that it would be extremely prejudicial to disrupt L.P.'s safe, stable home life where she has lived her entire life, especially after her case has been closed and she has been given a sense of permanency after eight years. See *Rodriguez v. Koschny¸* 57 Ill. App. 3d 355, 362 (1978) (finding prejudice to minor, as he lived with his adoptive parents since he was a little more than a week old); *In re Adoption of Miller*, 106 Ill. App. 3d 1025, 1033 (1982) ("it would be extremely prejudicial to the stability of the family life [the minor] has enjoyed to permit the natural father to wait almost two years after he learned of the adoption to attack it"). Thus, even if we had jurisdiction to review the 2017 order, we would find respondents' claim forfeited and barred by *laches*.

¶ 27   Because respondents do not make any other arguments pertaining to the appointment of Jennifer as L.P.'s legal guardian, we affirm the private guardianship order entered on April 25, 2024, as the manifest weight of the evidence in the record amply supports the circuit court's conclusion. Nonetheless, we reverse and remand for further proceedings, as we disagree that the limited visitation provision set forth in the order is reasonable or in L.P.'s best interest.

¶ 28                                   B. Reasonable Visitation

¶ 29   " 'Guardianship of the person' of a minor means the duty and authority to act in the best interests of the minor, subject to residual parental rights and responsibilities ***," including

"reasonable visitation (which may be limited by the court in the best interests of the minor ***)." 705 ILCS 405/1-3(8)(b), (13) (West 2022). We will reverse a trial court's disposition regarding visitation "only if the court's findings are against the manifest weight of the evidence ***." *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 81. Such is the case here, as the court's findings for imposing minimal visitation and leaving it purely within Jennifer's control is unreasonable and arbitrary.

¶ 30 We recognize the court did not limit respondents' visitation to once a month. But once a month is all that Jennifer needs to do to comply. The visitation provision also leaves it solely within Jennifer's control to withhold unsupervised visitation if she deems it necessary for the safety or protection of L.P. and to cancel individual visits if appropriate. Certainly, we agree Jennifer should not subject L.P. to endangerment during visits. But she should not be the sole arbiter in unilaterally changing unsupervised visitation to supervised or determining the length of each visit.

¶ 31 The record shows Jennifer's preference is to limit visits to an hour, albeit she indicated a willingness to provide more time for school or special events and depending on L.P.'s wishes. The record also shows tension between Jennifer and Raquel that could curtail the frequency, as it has in the past. L.P. should not be deprived of forming a stronger bond with respondents and her siblings because of their adult strife.

¶ 32 Carillo-Acosta's opinion and the 2023 evaluations and reports all favor increased visits. They are the most objective evidence in the record. Carillo-Acosta, in particular, testified that one visit a month is insufficient to foster a bond between L.P. and her biological parents and siblings. She also testified L.P. would suffer no harm from longer and more frequent visits. In

fact, she believed they would be in L.P.'s best interest. Even the court left open the possibility of more frequent and longer visits and encouraged the parties to expand them.

¶ 33    L.P. is over eight years old and has lived with Jennifer for virtually her whole life. Respondents have worked to meet the parenting goals set by DCFS in order to maintain a safe environment for L.P. and other children. L.P.'s best interest is paramount in this proceeding, but respondents have rights too that should not be exercised solely at the whim of Jennifer. Although a guardian has the statutory authority and duty to act in the child's best interest, including the reasonable visitation, under the facts of this case, we conclude the court's visitation schedule is against the manifest weight of the evidence. We remand for the court to be provided with an update on visits as well as L.P.'s preference, safety and welfare, need for permanence, sense of attachments, and all other factors relevant to ensuring L.P.'s well-being and imposing a more reasonable parenting plan to encourage and foster contact between respondents and their child. See 705 ILCS 405/1-3(4.05).

¶ 34                                III. CONCLUSION

¶ 35    For the foregoing reasons, we affirm the trial court's private guardianship order appointing Jennifer as L.P.'s guardian and reverse and remand for the circuit court to impose a more reasonable visitation schedule.

¶ 36    Affirmed in part, reversed and remanded in part.